UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES,                      )
                                    )        No. 92-CR-10369-RWZ-2
                                    )
v.                                  )
                                    )
ALFRED TRENKLER,                    )
        *Defendant.*                )
_____)

**EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18
U.S.C. § 3582(c)(1)(A)
AND MEMORANDUM OF LAW IN SUPPORT**

Nancy Gertner (BBO # 190140)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
NGERTNER@FICKMARX.COM
ABARSKY@FICKMARX.COM

Scott P. Lopez (BBO # 549556)
LAWSON & WEITZEN LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210
617-439-4990 Ext 3076
splopez@lawson-weitzen.com

*Counsel for Defendant Alfred Trenkler*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ........................................................................................................... 5

   I.   Mr. Trenkler Satisfies the Statutory Exhaustion Requirement. ........................... 5

   II.  Mr. Trenkler Shows "Extraordinary and Compelling Reasons" Warranting
       Compassionate Release................................................................................. 6

      A.     Legal standard ................................................................................ 6

      B.     Mr. Trenkler shows extraordinary and compelling reasons based on his age and
            medical conditions, in light of the COVID-19 outbreak at USP Tucson............... 9

           1.   USP Tucson and the surrounding community are in the midst of a
                COVID-19 outbreak................................................................ 10

           2.   Mr. Trenkler is extremely vulnerable to a severe and potentially fatal
                infection. ............................................................................... 13

           3.   Neither the crime nor the sentence preclude compassionate release. ....... 15

      C.     The unique circumstances of Mr. Trenkler's case militate in favor of release..... 17

           1.   Mr. Trenkler's life sentence is an illegal sentence................................... 18

           2.   Mr. Trenkler's sentence is vastly disproportionate to Mr. Shay's. ........... 19

           3.   Serious questions persist about Mr. Trenkler's guilt and the fundamental
                fairness of his conviction. ........................................................ 20

   III. The 18 U.S.C. § 3553(a) Factors Favor Release................................................. 26

   IV. Mr. Trenkler Should Be Immediately Released To Quarantine at Home........................ 27

CONCLUSION......................................................................................................... 28

## INTRODUCTION

Alfred W. Trenkler is a 64-year-old prisoner incarcerated at USP Tucson who suffers from severe cardiac disease: his heart is so poorly functioning that it pumps only 20% of the blood out of his left ventricle. His conditions are irreversible and dangerous in the best of circumstances; they put him at grave risk of severe illness and death if he were to contract COVID-19. USP Tucson, where he is housed, is experiencing an outbreak of COVID-19, which has already claimed the lives of eight prisoners, while hundreds have been infected. Pima County (where USP Tucson is located) has among the worst outbreaks of COVID-19 in the country, its hospitals overloaded with COVID patients. Given Mr. Trenkler's advanced age, cardiac disease, and the COVID-19 outbreak at USP Tucson, Mr. Trenkler shows extraordinary and compelling reasons warranting a reduction in sentence under the Fair Sentencing Act ("FSA") ("compassionate release"), 18 U.S.C. § 3582(c)(1)(A), and the standards of 18 U.S.C. § 3553(a).

To be sure, Mr. Trenkler stands convicted of a serious crime, a conspiracy with Thomas Shay, Jr. to place explosives under a vehicle belonging to Shay, Jr.'s father. The bomb accidentally exploded, killing one Boston Police Officer and maiming another. Based on the Court's finding that the conspiracy's goal was to kill Shay Sr., Mr. Trenkler received a Life sentence, of which he has served 26 years. That is what the government argued at trial: Shay Jr. wanted to kill his father for the insurance proceeds he believed would accrue to him. Mr. Trenkler did not know Shay, Sr. (and barely knew Shay Jr.). Mr. Trenkler's motive to participate in the plan, according to the Government, was the opportunity to share in the insurance bounty. Years later, however, at Shay Jr.'s resentencing (after his conviction was overturned), the Government did an about-face: It agreed that Shay, Jr. had no intention to kill his father; nor was there evidence of any insurance policy. The theory underpinning Trenkler's conviction now

1

makes no sense: if the instigator of the plot meant only to destroy a car, his coconspirator could hardly be guilty of a conspiring to kill.

Over time, the pillars supporting both Mr. Trenkler's conviction and sentence have crumbled,[1] this in a case that was "weak and circumstantial"[2] to begin with – with no physical evidence linking Mr. Trenkler to the crime, and no witnesses. Critical evidence used to convict him was subsequently found to be inadmissible;[3] the evidence of motive and intent offered at trial was abandoned by the Government in the Shay Jr. case;[4] and serious doubt has been cast on whatever evidence is left. After Shay, Jr. was resentenced, the disproportion between the Court's treatment of the two could not be clearer: while Thomas Shay, Jr. was sentenced to 144 months for what the government presented at the re-sentencing as a prank that went horribly wrong, Mr. Trenkler got Life for what was presented at trial as an intentional killing. Worse, to the extent the physical evidence from the crime, now tested with modern forensic methods, might have proved Mr. Trenkler's innocence and the culpability of others, any opportunity to test that evidence was lost when the government destroyed the evidence.[5] All that remains as evidence against Mr.

---

[1] *See* Stephanie Hartung, Missing the Forest for the Trees: Federal Habeas Corpus and the Piecemeal Problem in Actual Innocence Cases, 10 *Stanford Journal of Civil Rights and Civil Liberties* 55 (2014).

[2] *United States v. Trenkler*, 61 F.3d 45, 62-63 (1st Cir. 1995) (Torruella, J., dissenting.)

[3] *See Trenkler*, 61 F.3d 45 (excluding the EXIS computer evidence which linked Trenkler to the bomb).

[4] *See* Exhibit 1 at 10-11 (Tr., Change of Plea, *United States v. Thomas A. Shay* (No. 92-10369)).

[5] *See* Exhibit 2 (Department of Justice Report of Destruction, No. 63212-92-2008C, Dec. 19, 2005).

Trenkler are the words of an inmate facing a lengthy sentence, who somehow wound up in a cell with him, testified against him, and was then released months after Mr. Trenkler was convicted.[6]

If that were not enough, this Court has already found that Mr. Trenkler's Life sentence was an illegal sentence to begin with, because the Court lacked the authority to impose it. *Trenkler v. United States*, No. 06-12072, 2007 WL 551620, at *1 (D. Mass. Feb. 20, 2007). That finding was not disputed by the appeals court.

In short, serving what this Court has found to be an illegal sentence of Life imprisonment, based on a conviction whose evidentiary foundation has crumbled, Mr. Trenkler now faces the threat of severe illness and death due to COVID-19. The Court should grant compassionate release based on his age, medical conditions, and the COVID-19 outbreak alone; the circumstances surrounding the case make that imperative all the stronger. He requests that the Court act now to release him, lest a questionable Life sentence become a death sentence.

## BACKGROUND

On November 29, 1993 a jury convicted Mr. Trenkler of violating 18 U.S.C. § 371 (Count 1) and 18 U.S.C. §§ 844 (d) and (i) (Counts 2 and 3), for his role in an explosion that killed a Boston Police officer and maimed another. D.E. 487. On March 8, 1994, he was sentenced to Life imprisonment on Counts 2 and 3, along with a sixty-month sentence on Count 1, the conspiracy charge, all to be served concurrently. D.E. 552.

---

[6] The witness was David Lindholm, who Judge Torruella described as having "serious credibility problems which make his testimony 'shaky,' to say the least," and noted that the circumstances of his meeting Trenkler were "a little too coincidental." *Trenkler*, 61 F.3d at 69 (Torruella, J., dissenting).

Between March 15, 1994 and February 20, 2001, Mr. Trenkler filed a direct appeal of his conviction, and several petitions under 28 U.S.C. § 2255. *See Trenkler v. United States*, 536 F.3d 85, 89 (1st Cir. 2008). All were denied. In 2007, Mr. Trenkler petitioned for a writ of *coram nobis*, a remedy to correct "errors of the most fundamental character" that have occurred in a criminal proceeding. At the time of Mr. Trenkler's sentencing, both subsection (d) and (i) of 18 U.S.C. §844 provided for life imprisonment only "if the jury shall in its discretion so direct." *See Trenkler v. United States*, No. 06-12072-RWZ, 2007 WL 551620, 2007 U.S. Dist. LEXIS 11802, at *2 (D. Mass. Feb. 20, 2007) (quoting 18 U.S.C. § 34, as incorporated by 18 U.S.C. § 844 (1993)). This Court agreed that because the jury had not directed the Life sentence, it was an unlawful sentence. *See id.* Neither the government nor defense counsel nor probation had brought this error to the Court's attention. *See id.* at 2-*3. Granting the petition, the Court set aside Mr. Trenkler's sentence and resentenced him to a term of years. *See* D.E. 680. The Court of Appeals reversed on procedural grounds. *Trenkler v. United States*, 536 F. 3d 85, 100 (1st Cir. 2008).

On May 25, 2020, Mr. Trenkler filed a request for compassionate release with the Warden of USP Tucson. *See* Exhibit 3 (Warden Ltr., June 4, 2020). It was denied; the Warden stated that his "health issues are currently well controlled and will continued to be monitored." *Id*. In fact, within a month of the Warden's response, Trenkler's heart condition dramatically deteriorated; he was hospitalized at Banner University Medical Center in Pima**,** Arizona, not once, but twice, in June and July. *See* Exhibit 4 (Banner Health, Medical Records of Alfred Trenkler).[7] At the same time, the numbers of COVID cases at USP and the surrounding state

---

[7] Mr. Trenkler is separately moving to file his medical records under seal as Exhibit 4.

4

dramatically increased. Mr. Trenkler filed another request for compassionate release on November 28, 2020. *See* Exhibit 5 (Ltr to Warden, Nov. 28, 2020). He has received no response.

# ARGUMENT

**I.    Mr. Trenkler Satisfies the Statutory Exhaustion Requirement.**

Under the FSA, 18 U.S.C. § 3582(c)(1)(A), the Court may consider a defendant's motion for reduction of sentence when the defendant has exhausted administrative remedies or upon "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier [.]" 18 U.S.C. § 3582(c)(1)(A). Mr. Trenkler has satisfied this requirement because more than 30 days lapsed since he submitted his request to the Warden on November 28, 2020 with no response. *See United States v. Grinis*, No. 18-cr-10206-NMG (D. Mass. May 4, 2020), D.E. 162, at 3 (finding that defendant had "fully exhausted his administrative rights" by submitting a "request …which was considered and denied"); *United States v. Nance*, Case No. 7:92CR00135, 2020 U.S. Dist. LEXIS 4429, at *3-4 (W.D. Va. Jan. 10, 2020) (noting that the "statutory exhaustion requirement has been interpreted to excuse full exhaustion of administrative remedies [ ] if 30 days have elapsed without any response by the Bureau of Prisons to the inmate's re-quest"); *United States v. York*, No. 3:11-CR-76, 2019 U.S. Dist. LEXIS 119768, at *15 (E.D. Tenn. July 18, 2019) ("Because 30 days have passed since [petitioner's requests to the warden], the Court has authority to hear this matter under § 3582(c)(1)(A)"); *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 U.S. Dist. LEXIS

67953 at *5 (D. Or. Apr. 17, 2020) (finding exhaustion shown based on lapse of 30 days where warden denied the request within 30 days).[8]

## II.   Mr. Trenkler Shows "Extraordinary and Compelling Reasons" Warranting Compassionate Release.

Mr. Trenkler's severe cardiac conditions and his age, in light of the outbreak at USP Tucson, constitute extraordinary and compelling reasons for release, as do the unique and troubling circumstances of his case.

### A.  Legal standard

As amended by the FSA, § 3582(c)(1)(A) gives the Court the authority to grant a reduction in sentence if, "after consideration the factors set forth in section 3553(a)[,] … it finds that extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. § 3582(c)(1)(A)(i).  Prior to 2018, only the Director of the Bureau of Prisons ("BOP") could file a so-called "compassionate-release motion." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).[9] Although the BOP was first authorized to file compassionate-release motions

---

[8] Indeed, where the petitioner's condition is as serious as Mr. Trenkler's, most courts have concluded that the thirty-day requirement should not be enforced at all. *See, e.g., United States v. Guzman-Soto,* No. 1:18-cr-10086-IT, 2020 U.S. Dist. LEXIS 67912, at *13 (D. Mass. Apr. 17, 2020) ("the court finds it has authority and discretion to waive the thirty-day waiting period based on exigent circumstances" involving COVID-19); *United States v. Ramirez*, 459 F. Supp. 3d 333, 342-44 (D. Mass. 2020) (collecting cases waiving exhaustion requirement during COVID-19); *United States v. White,* 00-30027-MGM-4, D.E. 538 & 539 at 2 (D. Mass. April 10, 2020 ) (concluding that "the statute's exhaustion requirement is not jurisdictional, but is a claims-processing rule"); *United States v. Diaz*, No. 1:16-cr-10215-RWZ, D.E. 288 (D. Mass. April 23, 2020) (granting assented-to motion for compassionate release where defendant had "not made a 30-day administrative request," *see* D.E. 287 at 2).

[9] The Comprehensive Crime Control Act of 1984 first included the so-called "compassionate release statute" which allowed for a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A)(i); B P.L. 98-473, 98 Stat

in 1984, from 1984 to 2013, it rarely did so.[10] In 2013, the Office of the Inspector General reported that the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id*.

Against this backdrop, Congress passed the FSA, landmark legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). To improve and increase the use of the compassionate-release process, the FSA amended §3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.[11]

The substantive criteria of § 3582(c)(1)(A)(i) – the requirement of "extraordinary and compelling reasons" – remained the same as before. Congress never defined the term, except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. § 994(t). Rather, Congress

---

1837 (Oct. 12, 1984). Without such motion, district courts were unable to reduce a prisoner's sentence, even if they concluded that extraordinary and compelling reasons existed to do so.

[10] An average of only 24 inmates were released each year through BOP-filed motions. *See* Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n at 3 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). *Available at*: https://oig.justice.gov/testimony/t160217.pdf

[11] *See also United States v. Redd,* No. 1:97-cr-00006-AJT, 2020 U.S. Dist. LEXIS 45977 at *16 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); *Rodriguez,* 451 F. Supp. 3d at 396 n.7 (citing 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.")).

directed the Sentencing Commission to do so. *Id.*[12] The Commission issued a now-outdated policy statement *prior* to the passage of the First Step Act. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D).[13] At least four Circuits, as well as numerous district courts, have determined that the Commission's policy statement does not apply to motions brought after the passage of the FSA or does not, at any rate, constrain a district court's discretion to determine what constitute extraordinary and compelling reasons. *See United States v. Brooker (Zullo*), 976 F.3d 228, 236 (2d Cir. 2020) ("[I]f a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms apply to it" and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary or compelling"); *United States v. Jones*, __ F.3d __, 2020 U.S. App. LEXIS 36620, 2020 WL 6817488, at *1-2 (6th Cir. Nov. 20, 2020) ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling'

_____

[12] The Application notes to § 1B1.13 outline four categories of "extraordinary and compelling" circumstances: (A) medical condition; (B) age of the defendant; (C) family circumstances; and (D) "an extraordinary and compelling reason other than, or in combination with… (A) through (C)." *See United States v. Urkevich,* No. 8:03CR37, 2019 U.S. Dist. LEXIS 197408 at *6 (D. Neb. Nov. 14, 2019) (noting that the Commentary "does not suggest[s] the list is exclusive"); *United States v. Beck,* 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances").

[13] The very first sentence of § 1B1.13 limits the policy statement to motions filed solely by the BOP, not to motions filed directly in Court. Likewise, an Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]").

reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion"); *United States v. Gunn*, __ F.3d __, 2020 U.S. App. LEXIS 36612, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to Gunn's request. And because the Guidelines Manual lacks an applicable policy statement. . . [a]ny decision is 'consistent' with a nonexistent policy statement."); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) (finding, for same reason, that grants of compassionate release based on stacked § 924(c) sentences were proper); *see also, e.g., Beck*, 425 F. Supp. 3d at 579 (finding the policy statement provides guidance but does not constrain courts' discretion).

In short, the Court has wide latitude to determine whether Mr. Trenkler presents "extraordinary and compelling reasons" for release. It may consider Mr. Trenkler's serious medical conditions, his vulnerability to the pandemic, as well as the fundamental fairness issues surrounding his conviction and sentence.

### B. Mr. Trenkler shows extraordinary and compelling reasons based on his age and medical conditions, in light of the COVID-19 outbreak at USP Tucson.

A defendant may establish extraordinary and compelling reasons by showing that (1) he has a condition that elevates his risk of being seriously ill, or dying, from COVID-19; and (2) he faces an increased risk of exposure at his particular institution. *See Ramirez*, 459 F. Supp. 3d at 340 (defendant "make[s] a particularized showing of both individual susceptibility to the virus and a high risk of contracting it due to the conditions in [his] facility" (citation omitted)); *United States v. Moses*, No. JKB-16-323, 2020 U.S. Dist. LEXIS 215181, at *3 (D. Md. Nov. 17, 2020) (similar).

9

Particularly for the medically vulnerable, "nothing could be more extraordinary and compelling than this pandemic." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020). As of January 12, 2021 the United States had 22,522,749 confirmed COVID-19 cases, causing 375,124 deaths.[14] The infection rate among prisoners is four times that of the public at large, with one in five state and federal prisoners now having tested positive for COVID-19.[15] The death rate among prisoners is more than three times higher than among the general population, when adjusted for age and sex.[16] As of January 13, 2021, 189 prisoners have died of COVID-19 in BOP custody;[17] 42,066 have contracted COVID-19.[18] *See Rodriguez*, 451 F. Supp. 3d at 402 (noting the failure of the BOP's containment efforts).

1. <u>USP Tucson and the surrounding community are in the midst of a COVID-19 outbreak.</u>

---

[14] Centers for Disease Control and Prevention, Covid Data Tracker, (Jan. 12, 2021) https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days

[15] Schwartzapfel et al., "1 in 5 prisoners in the US has COVID-19, 1,700 have died," *ABC news* (Jan. 12, 2021), https://abcnews.go.com/Health/wireStory/prisoners-us-covid-19-1700-died-74797059

[16] Saloner et al. COVID-19 Cases and Deaths in Federal and State Prisons. *JAMA*, 2020;324(6):602-603, https://jamanetwork.com/journals/jama/fullarticle/2768249 .

[17] https://www.bop.gov/coronavirus/

[18] Marshall Project, "A State by State Look at Coronavirus in Prisons" (Jan. 8, 2021), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons#prisoner-deaths ; *see also* Department of Justice Office of the Inspector General, COVID-19 Data Dashboard, (Jan. 12, 2021), https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_1/

USP Tucson is experiencing a COVID-19 outbreak which has already claimed the lives

of eight prisoners.[19] As of January 12, 2021, the facility reports 89 positive prisoner cases and 76

positive staff members. *Id*. The prison states that 685 inmates and 31 staff have "recovered," but

it is not at all clear what those figures mean, what kind of testing was done and when. *Id*. As of

January 12, 2021, USP Tucson was the BOP high security facility with the most inmate deaths

from COVID-19. *Id*. It is one of the 10 BOP facilities with the most inmates who have tested

positive for COVID-19 since March 2020. *Id*. It also has the highest number of currently infected

staff, 76 staff members. *Id*.

   The situation in the health facilities in the county surrounding USP Tucson is equally dire.

COVID-19 daily hospitalizations in Arizona have surged.[20] The hospitals in Pima County are at,

if not over capacity.[21] The total number of COVID-19 positive inpatients in Pima County

---

[19] *See* https://www.bop.gov/coronavirus/

[20] *See* https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (Jan. 13, 2021); *see also* Pima County Health Department, Pima County COVID-19 Deaths, Cases, and Hospitalizations Report, Jan. 11, 2021, https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Government/Health/COVID-19%20Documents/Reports/Deaths,%20Cases,%20and%20Hospitalizations%20Report/Death,%20Case%20&%20CLI%20Report_1.11.2021.pdf . One news outlet reports that Arizona has one of the highest infection rates in the world. *See* https://www.nbcnews.com/science/science-news/these-three-states-have-worst-covid-infection-rates-anywhere-world-n1252861

[21] Public Health Advisory Update Covid-19 December 21, 2020, Pima County Health Department (January 2, 2021), https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Government/Health/COVID-19%20Documents/COVID%20Webpage%20Docs/Health%20Advisories/Dec.%2021%20COVID-19%20Public%20Health%20Advisory.pdf .  The public health advisory from the Pima County Health Department stated: "We have surpassed critical levels of hospital bed usage due to the high rate of community-wide spread occurring in Pima County. In the last week, there have been multiple times when there has been no ICU bed availability in Pima County; at different times, hospital medical- surgical beds have also reached capacity. Modeling indicates that public health

11

reached an all-time high on January 6, 2021.[22] As of January 8, there were only 10 Adult ICU
beds and 95 hospital beds in all available in Pima County.[23] The month of December, 2020 had
the highest number of new cases of COVID-19 in Pima County reported since data collection
began on March 1, 2020.[24] Arizona is down to 145 ICU beds available and 667 regular beds.[25]
Daily cases in Arizona are increasing, literally each week from November 23rd through January
4th. *Id*. On January 4, 2021 Arizona reported an all-time high of 11,424 new cases in a single day
after setting a new daily case number record each week for the preceding month. *Id*. As of
January 12, 2021, Arizona had the highest number of new cases per capita in the country in the
previous seven days.[26]

---

and healthcare resources in Pima County will continue to be further stretched and demand for
those resources will overwhelm the healthcare system within the next two to three weeks."

[22] Pima County Health Department, Pima County Hospital Capacity Report, Jan. 8, 2021,
https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Health/COVID-
19/1.8.2021%20EMRdocx.pdf

[23] Pima County Health Department, Pima County Hospital Capacity report 1/8/2021
https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Health/COVID-
19/1.8.2021%20EMRdocx.pdf

[24] Pima County Health Department, Pima County COVID-19 Deaths, Cases, and
Hospitalizations Report 1/08/2021,
https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Health/1.8.2021%20Death%20Case%
20%20CLI%20Report_.pdf

[25] Data Dashboard, Arizona Department of Health Services, (Jan. 12, 2021, 6:30 PM)
https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-
epidemiology/covid-19/dashboards/index.php

[26] Centers for Disease Control and Prevention, Covid Data Tracker, (Jan. 12, 2021)
https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days

2. <u>Mr. Trenkler is extremely vulnerable to a severe and potentially fatal infection.</u>

Mr. Trenkler has rapidly deteriorating, inter-related heart conditions. *See* Exhibit 6 ¶ 6 (Declaration of Morgan C. Esperance, MD MPH) ("Esperance Decl.").[27] He suffers from a complete heart block, defined as "a failure of his heart's conduction system that results in bradycardia (slow heartbeat.)" *Id*. ¶ 6d. Mr. Trenkler has had a pacemaker since 2006, when he was diagnosed with intermittent first-degree atrioventricular block, but by mid-2020 it malfunctioned. *Id*. In June, 2020 (after the Warden had determined that his condition was under control), Mr. Trenkler had to be hospitalized. *See id.* His heart rate – even with the pacemaker - had slowed dramatically with episodes of near loss of consciousness. *Id*. His heart block had progressed from a first-degree to a third-degree atrioventricular block. *Id*. While a pacemaker can treat a heart block by providing a direct electrical shock to one or both chambers of the heart when the heart's electrical system is slowed or stopped, when it is not working properly – as was the case in June of 2020 and perhaps months before - it can result in a dyssynchronous contraction that further injures the heart. *Id*.

At Mr. Trenkler's June 2020 admission, he was diagnosed with heart failure. Tests showed a severely reduced left ventricular ejection fraction, *see id.* ¶ 6a; his heart was so severely weakened that only 20% of the blood volume was pumped out (as contrasted with more than 70% in a normal heart). *Id*. ¶ 6a**.** His heart failure was due in part to an injury to the heart muscle from inadequate oxygen (ischemic cardiomyopathy) to which the pacemaker's malfunction contributed. *Id*. Mr. Trenkler was also diagnosed with underlying coronary artery

---

[27] Dr. Esperance's CV is attached thereto.

disease, with his blood vessels narrowed due to calcified plaque, exacerbating his heart problems; narrowing arteries cannot meet the demands of his heart muscle, increasing his risk for a myocardial infarction or heart failure. *Id*. ¶ 6b**.**

Even without COVID-19, Mr. Trenkler is essentially at the point of needing a heart transplant. *Id.*  ¶ 8 ("[a]n LVEF below 20% is associated with poor survival and is an indication for cardiac transplant"). His condition is irreversible. *Id*. Indeed, only 21% of patients in his condition survived for another 12 years. *Id*. He requires close monitoring by medical specialists, and the ready availability of a hospital, especially if his pacemaker malfunctions again. *Id*. ¶ 7**.**

Mr. Trenkler's ability to receive the care that he needs – regular monitoring by medical specialists and periodic hospitalization – is severely compromised because Pima County's hospitals are dangerously overloaded with COVID cases.[28] As of January 1, 2021, one paper reported that health officials believe that they will have to start rationing care in the Banner Health system where Mr. Trenkler has been treated.[29]

There can be no doubt that Mr. Trenkler, should he contract COVID-19, faces a high likelihood of acute infection and death. *See* Esperance Decl. ¶ 9. The CDC recognizes his cardiac

---

[28] Public Health Advisory Update Covid-19 December 21, 2020, Pima County Health Department, (January 2, 2020, 2:15 PM), https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Government/Health/COVID-19%20Documents/COVID%20Webpage%20Docs/Health%20Advisories/Dec.%2021%20COVID-19%20Public%20Health%20Advisory.pdf.

[29] "Health officials: Arizona hospitals likely to implement triage care for COVID-19 patients," *News 4 Tucson* (January 1, 2021), https://kvoa.com/news/top-stories/2021/01/01/health-officials-arizona-hospitals-likely-to-implement-triage-care-for-covid-19-patients/.

conditions as putting him at "increased risk for severe illness," defined as "hospitalization, admission to the ICU, intubation or mechanical ventilation, or death."[30]

### 3. Neither the crime nor the sentence precludes compassionate release.

Courts around the country have granted compassionate release to prisoners serving life sentences, including mandatory life sentences. Congress expressly intended for compassionate release to be available to such individuals. *See* 18 U.S.C. § 3582(c)(1)(a)(ii) (providing for compassionate release for individuals sentenced to mandatory life imprisonment under 18 U.S.C. § 3559(c)). For example, in *United States v. Wong Chi Fai*, No. 93-cr-1340-RJD, 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019), Judge Dearie granted compassionate release to a defendant serving life for extortion and racketeering conspiracies, as well as murders in furtherance of those conspiracies, arising from his participation in a gang from New York City's Chinatown. *See id.* at *2. The defendant, aged 65, had served 26 years of a life term and suffered from thyroid cancer. *See id.* at *3. Judge Dearie found that "notwithstanding the seriousness of [the defendant's] criminal conduct, the sentence served, combined with the period of supervised release that will follow, appropriately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *Id.* at *13 (internal quotation marks and brackets omitted). "At this stage, to require [the defendant] to serve out the rest of his sentence would be greater than necessary to serve the purposes of 18 U.S.C. § 3553(a)." *Id* (internal quotation marks omitted).

---

[30] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

Numerous courts have done the same. *See, e.g., United States v. Curtis*, No. 03-533-BAH, 2020 U.S. Dist. LEXIS 70804 ((D.D.C. Apr. 22, 2020) (granting compassionate release to man serving life sentence for sex trafficking, based on medical conditions and COVID-19); *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 U.S. Dist. LEXIS 84957, at \*15-19 (W.D. Tex. May 14, 2020) (granting compassionate release to 71-year-old man 17 years into a life sentence for drug offenses, based on chronic medical conditions and COVID-19); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM-01, 2019 U.S. Dist. LEXIS 78370, at \*3 (S.D. Ind. May 9, 2019) (granting compassionate release to 72-year-old serving life sentence with medical conditions); *United States v. Millan*, No. 91-CR-685-LAP, D.E. 1060 (S.D.N.Y Apr. 6, 2020) (granting compassionate release to 57 year old man who had served 30 years of a life sentence); *United States v. Gray*, 416 F. Supp. 3d 784, 786 (S.D. Ind. 2019) (granting compassionate release to 64-year-old with liver cancer serving a life sentence for drug offenses). *See, e.g., United States v. Asaro*, No 17-cr-127-ARR, D.E. 176 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release to "high-level member of the Bonano crime family" who was 85 years old with "an extensive list of medical conditions"); *United States v. Hammond*, No. 02-294- BAH, 2020 U.S. Dist. LEXIS 67331, at \*1 (D.D.C. Apr. 16, 2020) (indicating court would grant compassionate release to 75-year old man with resurgent prostate cancer who had served 18 years of a 355-month sentence, in light of COVID-19 outbreak); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM-01, 2019 U.S. Dist. LEXIS 78370, at \*3 (S.D. Ind. May 9, 2019) (granting compassionate release to 72-year-old serving life sentence with medical conditions); *United States v. Millan*, No. 91-CR-685-LAP, D.E. 1060 (S.D.N.Y Apr. 6, 2020) (granting compassionate release to 57-year-old man who had served 30 years of a life sentence).

**C.  The unique circumstances of Mr. Trenkler's case militate in favor of release.**

"Extraordinary and compelling reasons" under the FSA encompasses consideration of the

fundamental unfairness of a conviction and sentence, including when injustice derives from

developments in the law and in the facts. *See United States v. McCoy*, 981 F.3d 271 (4th Cir.

2020) (affirming grants of compassionate release based on stacked § 924(c) sentences); *United*

*States v. Decator*, 452 F. Supp. 3d 320, 324 (D. Md. 2020) (same); *United States v. Johns*, No.

CR 91-392-TUC-CKJ, 2019 WL 2646663, 2019 U.S. Dist. LEXIS 107850, at *8 (D. Ariz. June

27, 2019) (granting based on health concerns and considering fact that similarly situated

defendants often receive lower sentences for drug trafficking crimes today); *United States v.*

*Cano*, No. 95-cr-00481, 2020 WL 7415833, 2020 U.S. Dist. LEXIS 239859, at *4 (S.D. Fla.

Dec. 16, 2020) (reducing life sentence to time served, based on health, pre- and post-*Booker*

sentencing discrepancy, and rehabilitation); *United States v. Derricoatte*, 2020 WL 5629095, at

*1 (N.D. Ohio Sept. 21, 2020) (granting release where defendant would no longer be a career

offender under current law); *United States v. Wahid*, 2020 WL 4734409, 2020 U.S. Dist. LEXIS

146851, at *2 (N.D. Ohio Aug. 14, 2020) (changes to career offender status); *United States v.*

*Bryant*, 2020 WL 6686414, 2020 U.S. Dist. LEXIS 211797 (E.D. Washington Nov. 12, 2020)

(changes to armed career criminal status);  *United States v. Price*, 2020 WL 5909789, at *3

(D.D.C. 2020) (granting release to a  defendant serving a mandatory life sentence, where a

similar situated offender today would face 15-year mandatory minimum); *United States v.*

*Vigneau*, 473 F. Supp. 3d 31, 36  (D.R.I. 2020) (granting based on health and unusually long

sentence for the offense); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at * 2,4

(D. Neb. Nov. 14, 2019) (unusually long sentences by today's standards); *United States v.*

17

*Alexander*, No. 1:04 CR 529, 2020 U.S. Dist. LEXIS 198264, at *7 (N.D. Ohio Oct. 26, 2020) (granting based on asthma and post-sentencing rehabilitation).

Here, the illegality of Mr. Trenkler's sentence, the disparity between his sentence and that of his co-defendant, and the profound questions about Mr. Trenkler's guilt are extraordinary, compelling, and militate in favor of relief.

### 1. Mr. Trenkler's life sentence is an illegal sentence.

As this Court found, Mr. Trenkler is serving an illegal sentence. At the time of his sentencing in 1994, life imprisonment for the crimes of which Mr. Trenkler was convicted could only be imposed by a jury, not the court. *See* 18 U.S.C. § 844 (1993); 18 U.S.C. § 34. The problem was that no one flagged the error: "[W]hile the court did not have the authority to sentence Trenkler to Life imprisonment on the explosives counts under the express language of the statute neither the government nor the defense counsel nor probation brought section 34 to the court's attention at the time." *Trenkler v. United States*, No. 06-12072-RWZ, 2007 WL 551620, 2007 U.S. Dist. LEXIS 11802, at *2-3 (D. Mass. Feb. 20, 2007). Six months after Mr. Trenkler was sentenced, the statute was amended, excising the requirement that a Life sentence had to be imposed by a jury. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, §§ 60003(a)(1), 60003(a)(3)(A), 60003(a)(3)(C) (September 13, 1994). Not only did trial counsel, the prosecutor, probation and the Court miss this error at Mr. Trenkler's sentencing, so did every other lawyer representing Mr. Trenkler over the course of the next ten years. *See Trenkler*, 2007 U.S. Dist. LEXIS 11802 at *2-3.

Finally, in 2003, after Mr. Trenkler wrote to the Court after reading about a similar sentencing error, *id*. at *4, the Court appointed counsel to file a writ of *coram nobis,* and the Court found that the error comprised an actual miscarriage of justice sufficiently "extraordinary

and compelling" to warrant *coram nobis* relief. *Id*. at *17. While the First Circuit ultimately

reversed the grant on procedural grounds – that the failure to raise the issue meant it had been

waived – it did not challenge this Court's basic findings: that Mr. Trenkler is serving an illegal

life sentence; that the Court did not have the authority to impose it when it did, and that the error

is "fundamental to the validity of the judgment," *Trenkler,* 536 F. 3d at 100.

> 2.  Mr. Trenkler's sentence is vastly disproportionate to Mr. Shay's.

The disproportionate treatment between Mr. Trenkler and Mr. Shay could not be clearer:

while Thomas Shay, Jr. was sentenced to 144 months for a prank that went horribly wrong, as

the government's presentation at resentencing suggests (*see* § II.C.3.a, below), Mr. Trenkler got

Life.[31] Courts have considered this kind of unfairness in making compassionate release

determinations. *See, e.g., United States v. Anders*, No. 94-cr-668-JAH, D.E. 338 at 7 (noting, in

discussion of § 3553(a) factors, that the defendant "received a sentence that is decades longer

than any other co-defendant"); *United States v. Price*, No. 07-0152-06 (ESH), 2020 U.S. Dist.

LEXIS 184784, at *13-*16 (D.D.C. Oct. 6, 2020) (granting in part based on the "stark and

unwarranted sentencing disparities between Mr. Price's life sentence and the sentences of his

more culpable co-conspirators" and noting that the co-defendants had been released, while the

defendant was still serving a life sentence); *Cano*, No. 95-cr-00481, 2020 U.S. Dist. LEXIS

239859, at *16 (reducing life sentence to time served, in part based on disparities between co-

defendants).

---

[31] Shay Jr. was initially sentenced to 188 months and 60 months to be served concurrently. D.E.
351. After his conviction was overturned, he was resentenced to 144 months. D.E. 631.

3. <u>Serious questions persist about Mr. Trenkler's guilt and the fundamental fairness of his conviction.</u>

Mr. Trenkler has steadfastly maintained that he is innocent of the crime for which he stands convicted. Since the conviction, and as the evidence against him has eroded, a chorus of voices has called for his exoneration, from the New England Innocence project,[32] to some of the jurors who served on the case,[33] to members of the Boston Police Department who investigated.[34] These incredibly serious questions should be taken into consideration. *See Cano*, 2020 U.S. Dist. LEXIS 239859, at *2 (granting in part based on "the need to correct manifest error and prevent injustice" and reducing life sentence to time served).

The crime of which Mr. Trenkler stands convicted was horrifying, to be sure, but from the outset there were serious problems in the case against him, which have only grown over time. On October 28, 1991, police were called to the home of Thomas Shay, Sr. in Roslindale, to investigate a suspicious object in Shay Sr.'s driveway, which had apparently become dislodged from under his car. *Trenkler*, 61 F. 3d at 47. The object was an explosive device, which detonated while two members of the Boston Police Department Bomb Squad were examining it, killing one, maiming the other. *Id.*[35] Suspicion began to focus on Shay Sr.'s son, who, in a series

---

[32] *See* https://www.newenglandinnocence.org/innocence-blog/2016/10/7/alfred-trenkler-an-innocent-man .

[33] *See* D.E. 728 (Letter from juror Robert Woods); D.E. 730 (Letter from juror Marie O'Hare); D.E. 732 (Letter from juror Marie Lapson).

[34] *See* Gelzinis, "Cops Earn Salute for Seeking Truth, Justice," *Boston Herald*, Nov. 22, 2009, at 5, https://www.bostonherald.com/2009/11/22/cops-earn-salute-for-seeking-truth-justice/ .

[35] Suspicion initially focused on Shay Sr. He had sued the Dedham Service Center, where his business was located, over an explosion that had taken place on its premises. Shay Sr. was

of bizarre and incriminating statements, told television reporters that the bomb had been meant

for him.[36] Shay Jr. had a history of mental illness; his statements during the investigation, as well

as before and after his trial and that of Mr. Trenkler were contradictory; and he has since

recanted his statements implicating Mr. Trenkler in the crime. *See United States v. Shay,* 57 F.3d

126, 128-29 (1st Cir. 1995).  Suspicion eventually shifted to Mr. Trenkler, after his name was

found in an address book belonging to Shay Jr. *See Trenkler*, 61 F.3d at 49. The investigating

officers believed Trenkler and Shay had had what was then considered an illicit relationship,[37]

although as this Court noted, "evidence of the association between the defendant and Mr.

Trenkler is relatively slim." Exhibit 8 at 3-4 (Tr., *United States v. Shay*, Jury Trial, Day 16).

Trenkler and Shay Jr. were indicted as co-defendants; Shay Jr. was tried separately and

was convicted first. Shay received a term of 188 months and 60 to be served concurrently. D.E.

351. Shay Jr.'s conviction was overturned on appeal; he was resentenced to 144 months. D.E.

631. After eighteen days of trial, Trenkler was convicted as well. D.E. 445, 487. The Court

---

worried that people were trying to kill him in conjunction with that lawsuit – he was afraid to
start his car, lest it explode.

[36] Jack Sullivan, Son Says Bomb Meant for Him, *Boston Globe*, Nov. 1, 1991;
https://bostonglobe.newpapers.com/image/439658065 (downloaded on January 14, 2021)
(requires logging in to Globe archives).

[37] The atmosphere in which the Trenkler trial took place must be taken into consideration. Mr.
Trenkler's homosexual relationship with Mr. Shay was wrongly highlighted to the jury and was a
recurring theme in the press coverage. *See* Exhibit 7 at 41 (Tr., Trenkler Jury Trial, Day 17)
(government closing referring to "defendant's relationships with these younger males and his
readiness and inclination to cultivate and maintain these relationships"); D.E. 728 (juror letter
stating "I also believe Mr. Trenkler was convicted of being homosexual"). In the 1990s, the
coverage had a different resonance than it would have had if the case had been tried today. *See*
Matthew Brelis, Suspect in fatal bomb blast arraigned, *Boston Globe*, Dec. 18, 1992.

21

sentenced Trenkler to concurrent terms of Life imprisonment on the counts of receipt of

explosive materials and attempted malicious destruction of property by means of explosives, and

sixty months on the conspiracy count. D.E. 552. Key to that sentence was the finding that Mr.

Trenkler and Mr. Shay Jr. intended to kill Shay Sr. *See* D.E. 678 at 2-3 (Def. memorandum

quoting sentencing transcript).

 The case against Trenkler was circumstantial from the beginning. No physical evidence

linked him to the crime and there were no eyewitnesses. The prosecution instead cobbled

together a case that: (1) Mr. Shay Jr. intended to kill his father to get insurance proceeds[38] and

Mr. Trenkler conspired with him to carry out Shay's plan, *see Trenkler*, 61 F.3d at 48; (2) a law

enforcement database (EXIS) purportedly showed that the bomb in the Roslindale case matched

a device used in an earlier explosion in Quincy, in which Mr. Trenkler had been involved, *see*

*Trenkler*, 61 F.3d at 57-61;[39] and (3) a jail-house confession recounted by an inmate, David

Lindholm. *Id.* at 61. Almost all of this evidence – save the Lindholm confession – has since been

---

[38] *See* Exhibit 6 at 34 (government arguing, in closing, that "Shay, Jr., learns that this lawsuit survives if my father is not around, and I'm an heir at law. There's 300 to $400,000 insurance coverage available.").

[39] The Government also relied on the statements of Thomas Shay, Junior. The out of court statements were introduced at Trenkler's trial, although Shay had invoked his Fifth Amendment right not to testify. The record was clear; the government used those statements even though the prosecution did not trust them. In one letter, the Assistant United States Attorney indicated that they approached Shay's statements with a "high degree of skepticism." Exhibit 9 at 2 (Paul Kelly, Memo to File, Nov. 10, 1992) (listing several pages of "untru[ths]" told by Mr. Shay). By the time of Trenkler's trial, the Government fully understood his questionable mental status. *See* Exhibit 10 at 95-97 (Tr., Trenkler Jury Trial, Day 7) (Court discussing testimony regarding Shay's mental status and concluding that "This is a witness whose uncross-examinable statement the government is offering. By its own evidence, this witness is absolutely and totally incredible"); *see also Shay*, 57 F.3d at 129-30.

found by the First Circuit to have been either admitted in error (the EXIS database), repudiated by the government in the Shay Jr. resentencing (motive and intent theory), or undermined by subsequent events.

> ### a. The government itself has rejected the theory of motive and intent presented at trial.

With the resentencing of Mr. Shay, Jr. on October 29, 1998, the government completely rejected the motive and intent theory it had relied upon during Mr. Trenkler's trial and sentencing. Instead, it insisted that Shay Jr. had not intended to kill his father; he merely wanted to damage his father's car. He had conspired with Trenkler to receive explosives for that purpose and that purpose alone. *See* Ex. 1 at 10-12. Insurance proceeds were never mentioned. *See id*. In contrast, in imposing a Life sentence for Mr. Trenkler, this Court found that, although "the government produced no direct evidence that Mr. Trenkler acquired the dynamite, designed the bomb, built the bomb, and participated in placing it under Shay Sr.'s car[,]…. Mr. Trenkler intended that the bomb kill Shay Sr." D.E. 678 at 3 (quoting from sentencing). The Life sentence relied on that finding of intent. *See id*. at 2-3.

Thus, Trenkler's Life sentence for an intentional killing has been rendered factually baseless by the government's about-face. If Shay, Jr. – the instigator of the plot – did not intend to kill his father, if Shay Jr.'s only purpose was the destruction of his father's property, Trenkler could hardly be guilty of a conspiring with Shay Jr. to kill Shay Sr.

> ### b. The EXIS computer has been found to be unreliable and incompetent evidence that should not have been admitted.

On the direct appeal of Mr. Trenkler's conviction, the First Circuit found that the Court erred in admitting evidence from the EXIS database. That evidence was offered to show that the Roslindale bomb matched a device used in a previous explosion in Quincy, in which Mr.

Trenkler was involved. The evidence should not have been admitted. That earlier Quincy

incident, referred to as a "bombing," *see Trenkler*, 61 F. 3d at 57-61, involved nothing more than

a flash simulator, which was later likened to a "firecracker." *Id.* at 67 (Torruella, J.,

dissenting). Trenkler was never convicted of any crime related to the Quincy incident. *Id.* Yet

information regarding the Quincy device had been fed into the EXIS computer, after Trenkler

was already a suspect, producing a contrived and biased report. *Id.* at 66-67. The government

offered it to show that the Roslindale device matched the Quincy device. *See id.* at 57-61

(majority opinion). The evidence produced by the EXIS computer was found by the First Circuit

to be inadmissible, unreliable hearsay, but the court nonetheless found the error harmless. *See id.*

at 60. In a strongly worded dissent, Judge Torruella opined that admitting the EXIS testimony

was not remotely harmless: the evidence undoubtedly persuaded the jury to overlook the

otherwise "weak circumstantial evidence of [the] defendant's guilt" and find him guilty beyond a

reasonable doubt. *Id.* at 62. Even more insidious was the suggestion of a "scientific" conclusion,

determined by a computer, that the identity of the perpetrator was the same in each incident. *Id.*

at 62-67.

### c. The testimony of the jailhouse informant was highly questionable.

Critical to the First Circuit's finding of harmless error was the testimony of David

Lindholm, who claimed that Trenkler had admitted to making the bomb while the two men were

incarcerated together. *Id.* at 50-51, 60-61. Lindholm is, in effect, the last remaining thread of

evidence supporting Mr. Trenkler's conviction.

The majority noted that there was no support in the record for a *quid pro quo* between

Lindholm and the government, which would have given Lindholm an incentive to inculpate Mr.

Trenkler. *Id.* at 51, 60 n.23. Again, Judge Torruella was skeptical. Lindholm, he suggested, had

major credibility problems and was serving a 97-month sentence for conspiracy to distribute

marijuana and tax evasion. And the circumstances of his meeting Trenkler "strikes me as a little

too coincidental."

> In my view, a reasonable juror might question whether Lindholm was placed in
> the orientation unit by the government for the purpose of obtaining a confession
> from Trenkler. If so, that juror would likely wonder what Lindholm got in return.
> Not surprisingly, Lindholm testified that he had no agreements with the
> government and that he did not receive any promises or inducements for his
> testimony.

*Id.* at 69 (Torruella, J., dissenting).

But in fact, immediately after Trenkler's conviction Lindholm did receive a substantial

sentence reduction. *United States v. Trenkler*, No. 97-1239, 1998 U.S. App. LEXIS 217, at *9

(1st Cir. Jan. 6, 1998). And the Assistant U.S. Attorney who sought the reduction pointed to

Lindholm's cooperation in the Trenkler trial for support. *See United States v. Lindholm*, No. 90-

10080-WD (D. Mass. July 19, 1994), D.E. 121 (Government's Motion for Reduction of

Sentence), attached as Exhibit 11. In a word, in a completely circumstantial case, where the

major evidence has been discredited, all that remains is the testimony of "an inherently

unreliable alleged jailhouse confession." *Trenkler*, 61 F.3d at 70 (Torruella, J., dissenting).

> d. *The only physical evidence that could exonerate Mr. Trenkler was
> destroyed by the government.*

To be sure, Mr. Trenkler's efforts to challenge his conviction have been unavailing thus

far. Nor will he ever be able to test the physical evidence, using modern forensics, the most

direct route to exoneration. The government destroyed the physical evidence in 2005. Ex. 1. All

that remains, then, is a deeply flawed conviction and a wildly disproportionate sentence.

### III.    The 18 U.S.C. § 3553(a) Factors Favor Release.

Mr. Trenkler poses no danger to the community. He had no criminal record before this conviction. He has had no significant disciplinary issues in prison. His release decades ago, pending trial, demonstrated that he would follow whatever rules this Court imposes. Today, at 64, impaired by a serious heart condition, he surely is no public safety threat.

Mr. Trenkler has a safe and stable home to go home to. If released, he would reside with his half-brother David Wallace in Brunswick, Maine. Mr. Wallace would pick him up and provide him with a place to live, in which Mr. Trenkler can isolate him from the rest of the family as needed. Mr. Trenkler would also consent to lifetime supervised release and any other special conditions that Probation may deem necessary to ensure his compliance and community safety.

There are several hospitals in the area. As of January 2, 2021, Maine is one of the 12 states in the continental United States with the lowest average daily Covid-19 cases per capita, with 40 cases per 100,000 people, compared to Arizona's 129.5 cases per 100,000 people.[40] As of January 3, 2021, Maine was using less than 35% of its critical care beds.[41] The seven-day average of new hospitalizations in Maine peaked on December 13, 2020 at 17.1, and has been in decline since. *Id*. January 2, 2021's seven-day average of new hospitalizations was 8, less than

---

[40] Centers for Disease Control and Prevention, Covid Data Tracker, (Jan. 11, 2021) https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days

[41] Maine Center for Disease Control & Prevention, COVID-19: Maine Data, (Jan. 3, 2021) https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus/data.shtml

half of the December 13, 2020 peak. *Id*. Thus, Mr. Trenkler will be far safer at home than he is in prison.

## IV.    Mr. Trenkler Should Be Immediately Released to Quarantine at Home.

The BOP has adopted a practice of forcing prisoners approved for release to quarantine at the facility for 14-days before they can actually be released, even though this is not required. *See* William Barr, Memorandum for Director of Bureau of Prisons (Apr. 3, 2020) (making this optional).[42] This "quarantine" is often served in solitary confinement-like isolation. Forcing people into solitary confinement-like confinement for two weeks is cruel, unnecessary, and counterproductive. *See United States v. Scparta*, No. 18-cr-578-AJN, 2020 U.S. Dist. LEXIS 68935 at *9 (S.D.N.Y. Apr. 19, 2020) ("this is an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both Mr. Scparta and the public health of the community"); *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *105 (D. Conn. May 12, 2020) (ordering modification of that requirement); Declaration of Professor Seth Prins, *Grinis v. Spaulding*, No. 20-10738 (D. Mass. Apr. 27, 2020), D.E. 38-4 (describing the quarantine policy as inhumane and "ineffective as a health measure").

Because Mr. Trenkler can safely can self-isolate at home, the Court should order the 14-day quarantine *at home*. *See Scparta*, 2020 U.S. Dist. LEXIS 68935 at *31 ("the Court will require [defendant] to instead self-isolate for 14 days in his home"); *Robinson*, 2020 U.S. Dist. LEXIS 73575 at *10 ("Upon his release and during his term of home confinement, [defendant] will satisfy the 14-day self-quarantine requirement"); *Sawicz*, 2020 U.S. Dist. LEXIS 64418 at

---

[42] Available at: https://www.justice.gov/file/1266661/download

*10 (the defendant "shall be released immediately upon the institution's receipt of this Order, and shall instead [of quarantining at the facility] spend 14 days in quarantine at the place he shall reside"); *Asaro*, 2020 U.S. Dist. LEXIS 68044 at *24 ("Defendant . . . shall not spend 14 days in quarantine at MCFP Springfield prior to his release").

## CONCLUSION

In light of Mr. Trenkler's age and health conditions, the conditions at the prison in which he incarcerated and the surrounding community, his continued incarceration serves no useful purpose.  He is uniquely vulnerable to severe illness and death.  He moves this Court to reduce his sentence to time served and order his immediate release, under whatever terms of supervision the Court sees fit to impose.

Respectfully submitted,

ALFRED TRENKLER
By his attorneys,

/s/ Nancy Gertner
Nancy Gertner (BBO # 190140)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
NGERTNER@FICKMARX.COM
ABARSKY@FICKMARX.COM

Scott P. Lopez (BBO # 549556)
LAWSON & WEITZEN LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210
617-439-4990 Ext 3076
splopez@lawson-weitzen.com

Dated: January 15, 2021

## CERTIFICATE OF SERVICE

I, Nancy Gertner, as counsel to Defendant Alfred Trenkler, certify that on January 15, 2021, I caused the foregoing document to be served by ECF on the registered participants as indicated on the Notice of Electronic Filing.

/s/ Nancy Gertner
Nancy Gertner