**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

    v.

ALFRED TRENKLER,
        Defendant.

No. 92-cr-10369-RWZ-2

**GOVERNMENT'S OPPOSITION TO DEFENDANT**
**ALFRED TRENKLER'S EMERGENCY MOTION FOR**
**COMPASSIONATE RELEASE PURUSANT TO 18 U.S.C. § 3582(c)(1)(A)**

The government respectfully opposes defendant Alfred Trenkler's motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A).  Since his conviction in 1993 on charges arising out of his role in a bombing that caused the death of one Boston police officer and maimed another, Trenkler has engaged in what the First Circuit has described as a "kaleidoscopic array of post-conviction proceedings," *Trenkler v. United States*, 536 F.3d 85, 89 (1st Cir. 2008), each designed to overturn his conviction or reduce his sentence.  Each of those challenges has, however, been firmly rejected.  In his latest attempt to escape the punishment this Court concluded was just and appropriate, Trenkler rehashes several arguments regarding the legality of his sentence and weight of the evidence against him, which this Court and the First Circuit have already disposed of.  The only new claim Trenkler raises concern his heart condition which, medical records demonstrate, is under control and being treated.  Accordingly, Trenkler's motion should be rejected.

## RELEVANT BACKGROUND

### Trenkler's Sentence

A jury convicted Trenkler of conspiracy, in violation of 18 U.S.C. § 371, receipt of explosive materials with knowledge and intent that they would be used to kill, injure and intimidate, and cause damage to real and personal property, in violation of 18 U.S.C. § 844(d), and malicious destruction of property by means of explosives, in violation of 18 U.S.C. § 844(i), in connection with a bomb explosion in Roslindale, Massachusetts that killed Officer Jeremiah J. Hurley and maimed Officer Frances X. Foley, both veteran members of the Boston Police Department Bomb Squad.  While he survived, Officer Foley was left blind in one eye, with a traumatic brain injury and permanent damage to the left side of his body.  As the Court has previously found, "[t]his was a horrendous crime.  An absolutely innocent person doing his job

was literally blown apart and another seriously injured and maimed." Ex. 1 (Sentencing Tr. 3/8/94) at 60.

At Trenkler's sentencing on March 8, 1994, the Court stated:

> [T]he government produced no direct evidence that Mr. Trenkler acquired the dynamite, designed the bomb, built the bomb, and participated in placing it under Shay, Sr.'s car. Nevertheless, I am persuaded by the evidence that he was the designer, that he was the builder of this bomb, and that he knew what damage it could do; and that he participated in placing it not merely under the car, but under the driver's seat of the car.

> This evidence permits the inference, which I draw, that Mr. Trenkler intended that the bomb kill Shay, Sr.; and under the doctrine of transferred intent, he is responsible for the death of Mr. Hurley; and the appropriate guideline is 2Al.1 [the guideline applicable to First Degree Murder], which has a base offense level of 43.

> \*   \*   \*

> I sentence you to imprisonment for your life on Counts 2 and 3[.]

Ex. 1 at 27-28, 61.  In reaching this sentence, the Court considered that the Roslindale bomb "was, as the evidence showed, not the first, not the second, but the third bomb.  And the second one was not exactly a firecracker."  *Id.* at 59.  The Court also acknowledged that, while "there was little direct evidence of guilt," the "jury did find guilt and did so on the basis of circumstantial evidence which was strong, indeed."  *Id.*

Following his conviction and sentencing, Trenkler has engaged in an unsuccessful campaign to overturn the jury's verdict and to reduce his sentence.  Indeed, the First Circuit has affirmed Trenkler's conviction and life sentence on four occasions, despite his numerous evidentiary and legal challenges.[1]  None of the issues Trenkler now raises presents a sufficient basis to reduce his sentence.

---

[1] *See United States v. Trenkler*, 61 F.3d 45 (1st 1995); *United States v. Trenkler*, 134 F.3d 361 (1st 1998); 268 F.3d 16 (1st Cir. 2001); *Trenkler v. United States*, 536 F.3d 85 (1st Cir. 2008).

3

**BOP's Response to the COVID-19 Pandemic**

In opposing defendant's motion, the government does not minimize the risks COVID-19 presents. Mindful of the concerns created by the virus, the Bureau of Prisons ("BOP") has made and continues to make extensive efforts to stop the spread of the virus in its facilities, to move as many appropriate inmates to home confinement as possible, and to distribute available vaccines consistent with CDC guidelines. *See generally* Ex. 2 (Decl. of Shannon Bass). To date, these efforts include: (1) educating inmates and staff on infection-prevention measures and providing face masks; (2) implementing testing, quarantine, and isolation procedures; (3) minimizing the number of people coming into its facilities to limit potential exposure points; (4) engaging in enhanced cleaning and disinfecting measures; and (5) offering vaccines to all staff and to certain priority-level inmates. *Id.* As more vaccine supplies become available, BOP intends to offer the vaccine to additional inmates, consistent with CDC guidelines. *Id.* ¶ 84. These and other steps contradict any suggestion that BOP is failing to take meaningful steps to address the risk posed by COVID-19. They show that BOP takes the threat seriously, is working to mitigate it, and continues to update policies and procedures in accord with the relevant facts and recommendations of experts.

Because of these efforts, it was not until seven months into the pandemic that USP Tucson experienced its first COVID infection in the general population. Bass Decl. ¶ 78. Since that time, BOP has screened Trenkler for COVID symptoms nearly every day. *See* Ex. 3 (Excerpt of Trenkler Medical Records) at 1-12. Further, the outbreak arising from that initial infection in October 2020—the majority of which were asymptomatic cases—is now on the down slope, with only 28 inmates and 6 staff currently positive for the virus, and fewer inmates testing positive each week. Ex. 2 (Bass Decl.) ¶¶ 79, 81. Staff at USP Tucson have now received their first dose of the

vaccine, with the second dose to be administered this week.  *Id.* ¶ 84.  This, coupled with the mandatory quarantine procedures for all inmates coming into the facility, substantially minimizes the risk of a second outbreak at USP Tucson.  Further, certain high-risk inmates have already been offered the vaccine.  *Id.*  As more vaccines become available, it will be offered to more inmates, such as Trenkler, who falls in the Priority Level 2 category for vaccine administration.  *Id.*

**Trenkler's Health**

The government does not dispute that Trenkler has been diagnosed with heart block, cardiomyopathy, and non-obstructive coronary artery disease.  However, contrary to the depiction of Trenkler's health in his motion, he is nowhere near his deathbed.

Trenkler's heart block has been addressed via the placement of a pacemaker.  Ex. 4 (Decl. of Dr. David Goldberg), ¶ 17.   In June 2020, Trenkler's initial pacemaker, a dual-chamber pacemaker implanted in 2006, was at the end of its life.  *Id.* ¶ 6.  Accordingly, BOP transferred Trenkler to the hospital where his pacemaker was replaced with a biventricular pacemaker on June 10, 2020.  *Id.*

Trenkler's cardiomyopathy is likely improving, if not entirely reversing.  *Id.* ¶ 9.  The day before his pacemaker was replaced, Trenkler's cardiac efficiency, or ejection fraction, was measured at 25%, below the normal level of 55%.  *Id.* ¶¶ 7-8.  This result was likely caused by dyssynchronous contractions of the left and right heart ventricles which can result from a dual-chamber pacemaker, leading to pacing induced cardiomyopathy.  *Id.*  However, a biventricular pacemaker like the one Trenkler has now has been found to reverse pacing induced cardiomyopathy in approximately 75% of patients within the first year of implantation.  *Id.* ¶ 9.

Trenkler's coronary artery disease is minor and well-managed with medication.  *Id.* ¶ 11.  Specifically, Trenkler has no significant coronary obstruction and his condition is *not* causing

decreased blood flow. *Id.* What is more, Trenkler's medical team has rated him as "very fit," and indeed, before and after his pacemaker replacement in June 2020, Trenkler regularly exercised and continues to work out, including jumping jacks and push-ups. *Id.*

## ARGUMENT

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. *See Dillon v. United States*, 560 U.S. 817, 824 (2010). One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" if it finds "extraordinary and compelling circumstances warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Court must also consider the "factors set forth in section 3553(a) to the extent that they are applicable." *Id*.

A motion under § 3582(c)(1)(A) may be made either by BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* Here, more than 30 days have passed since Trenkler submitted his requests to the Warden at USP Tucson on May 25, 2020 and November 28, 2020.

## I.   Trenkler's Heart Condition Is Under Control, and BOP Has Taken Significant Measures to Reduce the Spread of COVID-19 at USP Tucson.

"[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (citation omitted). Here, however, Trenkler has presented with

heart conditions that, under current CDC guidelines, make him at risk of severe illness from COVID-19, which, under current guidance from the Department of Justice, is an "extraordinary and compelling circumstance." Notwithstanding this, the Declaration of Dr. Goldberg makes clear that Trenkler's heart block has been alleviated with the placement of a pacemaker. Ex. 4, ¶ 17. His cardiomyopathy has likely improved, if not reversed, since the replacement of his dual-chamber pacemaker with a biventricular pacemaker. *Id.* ¶ 9. And Trenkler's coronary artery disease is mild and non-obstructive. *Id.* ¶ 11.

In his motion, Trenkler goes further and suggests that, beyond the risk of severe illness from COVID, he also cannot receive the close monitoring and periodic hospitalization he needs for his heart conditions while incarcerated at USP Tucson, and should therefore be released to his half-brother in Brunswick, Maine.[2] But his medical records tell a different story. As an initial matter, Trenkler's heart conditions are already well-managed, and he likely needs only an occasional cardiologist appointment. *Id.* ¶ 18. In any event, each time he has needed specialized care, BOP has gotten him the care he needs, even during the pandemic. When he initially complained of an irregular pulse on June 9, 2020, he was immediately taken to the hospital, and his pacemaker was replaced the next day. Ex. 3 at 37-38. And, despite increasing numbers of COVID cases in Arizona, there has been no delay in getting Trenkler hospitalized for his subsequent complaints of chest pressure and racing heart. When he complained on December 26, 2020, BOP called an ambulance and he was taken to the hospital, where his pacemaker was

---

[2] Notably, Trenkler does not explain in his motion how he would travel the 2,800 miles from USP Tucson to his half-brother's home in Brunswick, Maine. Both car and air transport put Trenkler at risk of exposure to the virus, and unlike in the prison setting, there is no mandatory quarantine for his fellow air passengers or those with whom he may come into contact at rest stops along a drive. Similarly, Trenkler's request to self-isolate at his half-brother's home without going through an exit quarantine ignores that he will not be able to self-isolate without first coming into contact with potentially hundreds of others.

checked and adjusted.  *Id.* at 19.  Likewise, on January 6, 2021, BOP again transferred Trenkler to the hospital upon his complaint of a heavy feeling on his chest.  *Id.* at 85.  In both instances, Trenkler had no issue being seen and admitted to the hospital.  What is more, COVID cases in Arizona have been trending down since they peaked on January 4, 2021.[3]  Since the start of the pandemic, available emergency room beds have not dipped below 40%.[4]  As of this filing, more than 1,000 emergency room beds are available in the state.[5]

Additionally, COVID cases are also decreasing significantly at USP Tucson.  While there were 89 positive inmate cases as of January 12, 2021, *see* Def. Mot'n at 11, there are currently only 27 positive inmate cases at USC Tucson, and one at the medium-security FCI Tucson.  Ex. 2 (Bass Decl.) ¶ 81.  The number of new cases detected through USP Tucson's mass-testing efforts has slowed significantly.  *Id.*  Further, there are currently only six positive staff cases at the entire FCC Tucson.  *Id.*  What is more, medical staff began administering the COVID-19 vaccine to staff on January 4, 2021, with the second dose to be administered this week.  *Id.* ¶ 84.  Certain high-risk inmates also received the vaccine beginning January 6, 2021, although Trenkler's condition was not so severe as to put him in this cohort.  *Id.*  Nevertheless, Trenkler is "Priority Level 2" for receipt of the vaccine once the facility receives additional doses.  *Id.*

Given that life sentences contemplate a defendant serving out the remainder of his life, even at advanced ages, in prison, courts grant compassionate release in limited circumstances, generally where the defendant is no longer capable of physically caring for himself.  Indeed, in all

---

[3] *See* Arizona Dep't of Health Svcs., "Confirmed COVID-19 Cases by Day," available at https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last accessed Jan. 25, 2021).

[4] *See* Arizona Dep't of Health Svcs., "Hospital Bed Usage & Availability," available at https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last accessed Jan. 25, 2021).

[5] *Id.*

but one of the cases Trenkler cites, Def. Mot'n at 16, the defendants were wheelchair bound, could not provide self-care, or suffering a terminal illness.  This is not Trenkler's situation.[6]

## II.   __Trenkler's Claims of Wrongful Conviction Are Not Proper on a § 3582 Motion__

"[A] compassionate-release motion 'is not an opportunity to second guess or reconsider' the sentencing court's original decision."  *United States v. Roney*, -- Fed. App'x --, No. 20-1834, 2020 WL 6387844, at *3 (2d Cir. Nov. 2, 2020) (quoting *United States v. Ebbers*, 432 F. Supp. 3d 421, 429-30 (S.D.N.Y. 2020) ("in deciding motions for compassionate release, the Court should be wary of using the motion to 'correct' the sentencing court's original judgment or introduce unprincipled variance into the execution of duly-imposed sentences")).  Yet that is what Trenkler is asking the Court to do—both to reconsider the life sentence that the First Circuit reinstated in 2008, and to overturn the jury's verdict, which this Court and the First Circuit have upheld despite Trenkler's multitude of prior evidentiary and legal challenges.  Even if the Court were to consider these improper bases for a § 3582 motion, each of Trenkler's arguments fails.

*First*, Trenkler claims he is serving an illegal sentence.  Def. Mot'n at 18-19.  To be sure, that was this Court's belief when, having granted Trenkler's motion for a writ of *coram nobis*, it vacated Trenkler's life sentences and resentenced him to concurrent terms of 37 years.  *Trenkler v. United States*, No. 06-cv-12072-RWZ, 2007 WL 551620, *4-5 (D. Mass. Feb. 20, 2007), *rev'd*, 536 F.3d 85 (1st Cir. 2008); Ex. 5 (Sentencing Tr. 4/4/08).  As the Court and the parties recognized by the time of the *coram nobis* proceeding, the relevant statutes at the time Trenkler committed these crimes—18 U.S.C. §§ 841(d) and 841(i)—required a jury to determine whether a life sentence was appropriate, but by the time Trenkler was sentenced the requirement for a jury trial on the issue had been eliminated and this Court made the finding.  2007 WL 551620 at *1.  While

---

[6] What is more, only one of the defendants granted compassionate release in the cases Trenkler cites was involved in a crime that resulted in death or injury.

the Court expressed several reasons for its view that the life sentence it had imposed was "illegal,"

one such reason was that "the maximum allowable penalty without a jury finding was something

less than life." *Id.* at *5.[7]  But in reversing this Court's grant of the writ of *coram nobis*, the First

Circuit observed:

> [Trenkler] does not charge that a life sentence is beyond the statutory maximum for the crimes of conviction.   Rather, his claim is procedural: that the statutes of conviction required a jury recommendation in order to impose a life sentence, and that the judge, not the jury, made the recommendation in his case.   This claim, if true, does not suggest a miscarriage of justice.
>
> \*   \*   \*
>
> Rules that allocate decisionmaking authority between judge and jury are generally thought to be procedural.   [Citations omitted].   As such, the misallocation of that responsibility is unlikely to implicate the accuracy or fundamental fairness of judicial proceedings.

 536 F.3d at 99.

Moreover, while Trenkler contends that the First Circuit reversed the Court's *coram nobis*

decision on procedural grounds, *see* Def. Mot'n at 19, the primary procedural ground on which the

First Circuit reversed was a significant one: the First Circuit determined that this Court should

have treated Trenkler's application for the writ as a second or subsequent petition under 28 U.S.C.

§ 2255 and should therefore have forwarded it to the First Circuit, where permission to pursue it

would inevitably have been denied because the petition was premised neither on newly discovered

---

[7] During the resentencing the Court determined the same total offense level, 43, to apply, but this time did so based on the theory that the jury verdict indicated it had at least found that death had resulted from the use of explosive material to damage property, that this constituted felony murder, and that the first degree murder guideline accordingly applied. Ex. 5 at 62.  In so doing, the Court stated, "So, that is the offense level that I come to without making the fact findings that I believe now were, in fact, wrong."  *Id.*  In context, the government understands the Court to have been expressing the view that the findings were wrong because the jury should have made them rather than because the Court was wrong at the initial sentencing in determining that the placement of sticks of dynamite under the driver's seat of a car evinced a clear intent to kill his codefendant Thomas Shay Jr.'s father.

evidence nor a new rule of constitutional law. 536 F.3d at 98. But in reaching its decision, the First Circuit also rejected the notion that there had been any "miscarriage of justice" at all, much less one "sufficiently 'extraordinary and compelling' to warrant coram nobis relief." Def. Mot'n at 18-19 (citing 2007 WL 551620 at *3). As the First Circuit stated:

> The Supreme Court has defined the term "miscarriage of justice" as encompassing only those "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." [Citation omitted]. [Trenkler] makes no such claim: he does not challenge the sufficiency of the evidence upon which the sentencing judge acted, nor does he suggest that it was likely that a jury would have reached a different result.

536 F.3d at 99. Trenkler's invitation to revisit this issue is not permissible on a § 3582 motion. *Ronney*, 2020 WL 6387844, at *3.

*Second*, Trenkler suggests that at Shay Jr.'s resentencing on October 29, 1998, "the government completely rejected the motive and intent theory it had relied upon during [his] trial and sentencing" and "instead insisted that Shay Jr. had not intended to kill his father; he merely wanted to damage his father's car. He had conspired with Trenkler to receive explosives for that purpose and that purpose alone." Def. Mot'n at 23. But Trenkler's suggestion that, at Shay's resentencing, the government explicitly represented that Shay did not intend to kill his father is entirely mistaken: the government believed then, and believes to this day, that Shay and Trenkler did conspire to kill Shay Sr. The plea agreement and sentencing before Judge Harrington simply reflected the reality of the findings that this Court made at Shay's initial sentencing.

At that sentencing, this Court found highly persuasive the fact that Shay's jury had acquitted Shay on Count Two, charging a violation of 18 U.S.C. § 844(d), which, the Court noted, "was the only count in the indictment that called for proof of intent to kill." Ex. 6 (Shay Sentencing Tr. 10/8/93) at 103, 121. This Court determined that, with respect to the conspiracy count, Shay

"[was] guilty only of the conspiracy to attempt of [sic] malicious destruction of Shay Sr.'s car by means of an explosive"; that with respect to the violation of 18 U.S.C. § 844(i) the guideline for second degree murder, as opposed to first degree murder, applied; that the guidelines sentencing range was 151 months to 188 months; and that the appropriate sentence was the high end of that range, 188 months.  *Id.* at 100, 121-23, 136.

After this Court vacated Shay's conviction on remand from the First Circuit, the government and Shay entered into a plea agreement that simply reflected the reality of the facts and the guidelines range this Court found at the initial sentencing, with a two-point reduction in the range for acceptance of responsibility.  Def. Mot'n, Ex. 1.  There was no mention of insurance proceeds at the resentencing because this Court had determined at Shay's initial sentencing that he did not intend to kill his father.  *See supra.*  The government never said, and does not believe, that this horrific crime was simply a "prank that went horribly wrong."  Def. Mot'n at 2.

*Third*, Trenkler observes correctly that on his direct appeal, the First Circuit determined that evidence from the so-called EXIS database should not have been admitted, and that the First Circuit further determined that the error in the admission of this evidence was harmless.  Def. Mot'n at 23-24.  Trenkler is not, however, correct in suggesting that, in the absence of the EXIS evidence, a trial witness named David Lindholm "is, in effect, the last remaining thread of evidence supporting [his] conviction."  Def. Mot'n at 24.  While it is true that evidence from the EXIS database was adduced as part of the proof that the same person responsible for a device that exploded in Quincy in 1986—that is, Trenkler—was likewise responsible for the bomb that killed Officer Hurley and maimed Officer Foley, it was not, by any means, the only such evidence. Indeed, the First Circuit, in affirming Trenkler's conviction, carefully reviewed evidence regarding the Quincy bomb other than the EXIS database evidence to ensure that it had been properly

12

admitted under Fed. R. Evid. 404(b) as proof of the identity of the person who built the bomb at

issue here. *See* 61 F.3d at 51-56. In concluding that it was properly admitted, the First Circuit

recounted, among other things, the following testimony from an ATF expert, Explosives

Enforcement Officer ("EEO") Thomas Waskom:

> We begin by noting that the government's explosives expert,
> Thomas Waskom, testified that his analysis of the similarities shared
> by the two incidents left him with no doubt "whatsoever" that the
> same individual built both bombs. Our own review of the record
> reveals that the two bombs did indeed share a number of similar
> components and characteristics. Both bombs were remote-
> controlled, radio-activated, electronic explosive devices. Both were
> homemade mechanisms, comprising, in general, electronic
> components easily purchased at a hobby store. Both had similar,
> though not identical, firing and fusing circuits with separate battery
> power supplies for each. Both had switches in their fusing circuits
> to disconnect the radio receivers. To energize their respective radio
> receivers, both devices utilized similar power supplies, consisting of
> four AA batteries. Both employed many similar components such
> as batteries, duct tape, toggle switches, radio receivers, antennas
> solder, electrical tape, and large round speaker magnets. Moreover,
> both used a distinctive method (*i.e.*, twisting, soldering, and taping)
> to connect some, though not all, of the wires used. [Footnote
> omitted]. Though we hardly find any of these factors by themselves
> to be "highly distinctive," the coalescence of them is fairly
> persuasive. [Footnote omitted]. Indeed, even Trenkler's expert
> witness, Denny Kline, testified at the pretrial hearing that, in light of
> these similarities, "there is a possibility, a *probability,* that maybe
> *there is a connection* between the maker of these two bombs."
> (Emphasis added.)

61 F.3d at 54-55. After reviewing other evidence from the trial record beyond the physical

similarities of the two bombs tending to show that the same person had made them, and after

determining that the probative value of the evidence was not outweighed by the danger of unfair

prejudice, the First Circuit determined that this Court had properly admitted evidence regarding the Quincy bomb. *Id.* at 55-56.[8]

Accordingly, in determining that admission of the EXIS-derived evidence was harmless beyond a reasonable doubt, the First Circuit did not rely solely on the Lindholm testimony, although that certainly was part of the equation. Rather, the First Circuit stated:

> Initially we note the substantial evidence, beyond Trenkler's participation in the Quincy bombing, supported a finding that he had built the Roslindale bomb. Principally, David Lindholm convincingly testified that, in fact, Trenkler had actually admitted building the Roslindale bomb. Other admissions by Trenkler made to various law enforcement officers inferentially corroborated Lindholm's testimony, specifically Trenkler's sketch of the Roslindale bomb, drawn shortly after the explosion and conspicuously featuring two electrical blasting caps. Moreover, Trenkler's arrogant assertion to Agent Leahy that, "if we did it, then only we know about it … how will you ever find out … if neither one of us talk[]?" provided further corroboration. Additional support could be inferred from the ample evidence the government adduced establishing Trenkler's relationship with Shay Jr. and his knowledge of both electronics and explosives. [Footnote omitted].
>
> \*   \*   \*
>
> Our review of the record … convinces us that the EXIS-derived evidence was not a critical factor in the district court's decision to admit the Quincy bomb evidence for the purpose of proving identity. The EXIS-derived evidence was merely cumulative, corroborating the testimony of the government's explosives expert who, after testifying about the similarities between the two bombs, stated that he had no doubt "whatsoever" that the same person built both bombs. [Footnote omitted]. Moreover, … other circumstantial evidence tending to show that the maker of each bomb used a similar *modus operandi* (*e.g.,* both bombs built for a friend, both bomb makers used third party to acquire needed components) independently supported the inference that the same person built both bombs. Finally, even putting aside whether the jury would have found the two incidents sufficiently similar to prove identity

---

[8] While the defendant objects to the description of the Quincy incident as a "bombing" and prefers the dissent's description of the Quincy device as a "firecracker," Def. Mot'n at 24, citing 61 F.3d at 67, this Court, which heard all of the evidence, observed at Trenkler's sentencing that the device "was not exactly a firecracker, at least as I heard the evidence." Ex. 1 at 59.

> without the EXIS-derived evidence, the jury nonetheless would
> have been able to consider the fact that Trenkler had designed and
> built the Quincy bomb to prove Trenkler's knowledge and skill.

61 F.3d at 60.

In short, there was much more to the government's case, when stripped of the EXIS

evidence, than the testimony of David Lindholm.  For that reason, the First Circuit held, "no

rational jury could have entertained a reasonable doubt of Trenkler's guilt even in the absence of

the EXIS-derived evidence."  61 F.3d at 61 (footnote omitted).

*Fourth*, Trenkler suggests, based on the speculation of the dissent in his direct appeal, that

there must have been an undisclosed promise, reward, or inducement between the government and

Lindholm because "immediately after Trenkler's conviction Lindholm did receive a substantial

sentence reduction" and "the Assistant U.S. Attorney who sought the reduction pointed to

Lindholm's cooperation in the Trenkler trial for support."  Def. Mot'n at 24-25.

But there is no need to speculate.  This claim was pursued by Trenkler long ago as part of

one of his motions for a new trial.  In denying the motion, this Court said, *inter alia*:

> … Defendant argues that the early release from a federal prison
> sentence of [Lindholm], a government witness who testified against
> Trenkler, indicated evidence of a "sweetheart deal" between
> Lindholm and the government at the time of Lindholm's testimony
> which was not disclosed to Defendant. Based on the detailed written
> proffer submitted by the government and left unchallenged by
> Defendant, the record is devoid of any evidence to suggest that
> Lindholm's early release was the result of anything other than an
> arrangement made subsequent to the trial (by several months)
> between Lindholm and the government based on Lindholm's
> cooperation in the Trenkler trial. … Lacking any "new evidence"
> (or any evidence at all) of an agreement between Lindholm and the
> government at the time of Lindholm's testimony, Defendant's
> motion for a new trial is denied.

Ex. 7 (Mem. of Decision 2/4/97, Dkt. 597) at 2-3.  The First Circuit affirmed in an unpublished

opinion.  134 F.3d 361 at *3 ("[O]ur independent review of the evidence convinces us that the

district court did not abuse its discretion in denying an evidentiary hearing and a new trial on this issue.").

*Fifth*, Trenkler, in conceding that his "efforts to challenge his conviction have been unavailing thus far," complains "[n]or will he ever be able to test the physical evidence, using modern forensics, the most direct route to exoneration." Def. Mot'n at 25. But the defendant's own exhibit shows that the evidence was retained until 2005, by which time Trenkler's trial was over, his conviction affirmed on appeal, his motion for a new trial denied by this Court, his motion pursuant to 28 U.S.C. § 2255 denied by this Court, this Court's denial of Trenkler's motions for a new trial affirmed by the First Circuit, and this Court's denial of Trenkler's § 2255 motion as untimely likewise affirmed by the First Circuit. Equally importantly, Trenkler has not identified anything that a reexamination of the evidence would have uncovered that would have exonerated him or otherwise called into doubt his conviction.

III.   **The § 3553(a) Factors Weigh Heavily Against Reducing Trenkler's Sentence.**

When analyzing whether "extraordinary and compelling circumstances warrant . . . a reduction," the Court must also consider the "factors set forth in section 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A). Trenkler fares no better on a consideration of the § 3553(a) factors, which are discussed below to the extent they are relevant.

A.  **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

As the Court appropriately found, based on the evidence presented during the trial, the defendant, using his specialized expertise, designed and built a remote-control bomb with the intention that it be used to kill Thomas Shay, Sr. He participated in placing the powerful device, containing two or three sticks of dynamite, on the undercarriage of Shay Sr.'s car directly under the driver's seat, a location calculated to accomplish that intention. Ultimately, the bomb did not

succeed in its intended purpose, but what did occur was entirely foreseeable to the defendant. He must have known that if anything went awry with his plan, first responders called in to deal with the device, be they EMTs, firefighters, or, most predictably and as turned out to be the case, members of the Boston Police Bomb Squad, would be directly imperiled by the explosive. And so, as a direct, proximate, and readily foreseeable result of the defendant's actions, Officer Jeremiah Hurley, a married father of four children, was killed. Officer Hurley's partner, Officer Francis Foley, was seriously injured. He lost an eye, he had to endure multiple operations, and he had to leave behind forever the job and career that he loved.

The Court found that the defendant's conduct in this case amounted to premeditated first degree murder. The evidence fully supported that determination. Life imprisonment is the only appropriate sentence given the nature of the offense. Even if the defendant had led an exemplary life in all respects, aside from his commission of the instant offense, that would not be sufficient to warrant a lesser punishment for premeditated murder. But, as the Court noted, this was not the first but the *third* bomb the defendant had built. The more significant of the prior two was the second, which he constructed some five years earlier and then affixed to the undercarriage of a truck in an effort to intimidate the truck owner. In view of that history, a life sentence is all the more warranted.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Arguably, premeditated murder is the most serious of all possible criminal offenses. While such intentional murders do occur in a variety of manners, some more egregious than others, the Court aptly characterized the defendant's offense as "a horrendous crime," noting that an "absolutely innocent person doing his job was literally blown apart and another seriously injured and maimed." Ex. 1 at 60. That it was a police officer who was killed, while performing his duty

to protect and serve the public, and another officer doing the same who suffered life-altering injuries, makes Trenkler's offense all the more reprehensible.

Nor were the officers by any means the only victims of this horrendous crime.  The members of the officers' families, who suffered terribly the day this bomb exploded and have continued to suffer every day since, and who have borne faithful witness to the memory of Officer Hurley and the ongoing suffering of Officer Foley, are victims themselves of Trenkler's heinous crime.  *See* Ex. 8 (Ltrs. from Family Members); Ex. 9 (Ltrs. from Other Interested Parties).

The sentence of life previously imposed was necessary to promote respect for the law and to provide just punishment.  Here, the only alternative—a sentence of time served, or roughly 26 years—would be woefully inadequate to account for Trenkler's callous indifference to human life and the suffering that callous indifference has wrought.

### C.  The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

General deterrence requires nothing less than a life sentence in this case. Any person contemplating conduct of a like kind to that of the defendant needs to know with certainty that if he proceeds with his plan and death results from his actions, he will spend the rest of his life in prison.

### D.  The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

As this Court observed at his initial sentencing, Trenkler was responsible for three bombs. With respect to this case, as the Court found, he intended to kill Shay's father, and the government believes he did so with the expectation of sharing in the proceeds of an insurance policy.  With respect to the Quincy bomb, the evidence showed that Trenkler affixed it to the undercarriage of a fish truck and detonated it remotely as a favor to a friend who wanted to intimidate the owners of

a fish market.  Trenkler's age would not appear to have diminished his knowledge of bomb-making and electronics.

### E.  The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

While the defendant's motion is based on his concern that his medical conditions put him at an increased risk of a poor outcome if he were to contract COVID-19, the evidence shows that Trenkler's condition is far from as dire as he portrays.  He does suffer from non-obstructive coronary artery disease, but, as reflected in the records and in Dr. Goldberg's affidavit, this condition is well under control and does not obstruct blood flow.  *See* Exs. 3 & 4.  And, while he did present with cardiomyopathy when he was taken to the hospital last June, he was given a new pacemaker, and roughly 75% of patients in that situation experience a reversal of their cardiomyopathy.  *Id.*  Indeed, Dr. Goldberg's affidavit reveals that it is possible that, seven months after the new pacemaker was implanted, Trenkler may no longer be suffering from cardiomyopathy at all.  *Id.*

And this is critical to this Court's evaluation of the § 3553(a) factors.  The only significant condition from which Trenkler suffers with certainty at this point is coronary artery disease.  But based on the most recent medical records of which the government is aware, it is well under control at this juncture.  Even assuming arguendo that Trenkler does still have cardiomyopathy, that, too, is well under control and should be improving since his receipt of the new pacemaker.  Indeed, if he were unexpectedly to go into cardiac arrest, his new pacemaker includes a defibrillator that would help to stabilize Trenkler until he made it to the hospital.

Which brings us to the last point: every time Trenkler has needed emergency medical services, BOP has seen to it that he was taken to the hospital.  While Trenkler paints a bleak picture

of the availability of emergency hospital services in Arizona in light of the COVID pandemic, the data provided above show that there is every reason to believe that if the defendant requires emergency medical care in Arizona during the hopefully very limited time the pandemic persists, he will get it.

In sum, Trenkler receives health care, including emergency medical care, when he needs it, and accordingly his heart condition should not be a basis for cutting short the life sentence that he so richly deserves.

### F.  The Kinds of Sentences Available

This consideration brings into stark relief the problem with the relief available.  This Court cannot release Trenkler temporarily until the pandemic is over (which, one hopes, will be soon now that vaccines are available).  The Court has only two options: to release the defendant immediately, or to adhere to the life sentence the Court recognized in March 1994 to be appropriate given that the defendant's conduct had resulted in the death of one dedicated public servant and the maiming of another.  The balance tips overwhelmingly in favor of the sentence previously imposed.

### G.  The Sentencing Range Established for the Defendant's Crimes

This factor is simple: the guidelines at USSG § 2A1.1 provide for a sentence of life in prison.

### H.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Trenkler suggests that "[t]he disproportionate treatment between [him] and Mr. Shay could not be clearer: while Thomas Shay, Jr. was sentence to 144 months for a prank that went horribly wrong, … [he] got Life."  Def. Mot'n at 19.  But the First Circuit has recognized that this provision is primarily aimed at national disparities rather than codefendants, although it is possible for a

sentence to be substantively unreasonable owing to disparity with the sentence of a codefendant. *E.g.*, *United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015). That court has "routinely rejected disparity claims, however, because complaining defendants typically fail to acknowledge material differences between their own circumstances and those of their more leniently punished confederates." *Id.*

Such is the case here. As noted previously, this Court made a different finding at Shay's initial sentencing than it did at Trenkler's sentencing: with respect to Shay, the Court determined the applicable guideline to be that for second degree murder, while the Court determined that Trenkler's conduct constituted first degree murder. The high end of the resulting guidelines sentencing range for Shay was 188 months, which is the sentence this Court imposed. The resulting sentence for Trenkler, by contrast, was life, which also was the sentence the Court imposed.

Moreover, in sentencing Trenkler this Court was well aware of the sentence Shay had received. This is obvious for two reasons. First, this Court sentenced Shay. Second, this Court explicitly acknowledged the disparity and the reason for it at Trenkler's sentencing: "The fact that there is a difference or there will be a difference in the sentences between the two defendants is the result of the difference in their conduct and in their state of mind as I have found them to be." Ex. 1 at 60. While the government disagreed, and continues to disagree, that Shay did not share Trenkler's intent to kill his father, the disparity was based on this Court's view of the distinctions between the two. The fact that Shay ultimately was resentenced to 12 years because, at the time of the resentencing, he accepted responsibility for his conduct, does not alter the calculus.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Trenkler's motion to reduce his sentence.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Robert E. Richardson*
ROBERT E. RICHARDSON
KRISTEN A. KEARNEY
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be served on counsel of record as listed in the NEF.

Dated: January 25, 2021                    */s/ Kristen A. Kearney*