UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALFRED TRENKLER,<br>    Defendant. | No. 92-cr-10369-WES<br><br>*LEAVE TO FILE GRANTED*<br>*02/12/2021* |

**GOVERNMENT'S SUR-REPLY IN FURTHER OPPOSITION TO DEFENDANT ALFRED TRENKLER'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURUSANT TO 18 U.S.C. § 3582(c)(1)(A)**

The government respectfully submits the following sur-reply in opposition to defendant Alfred Trenkler's motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A) to address points raised in Trenkler's 19-page reply brief (Dkt. 763).

**I.    Trenkler's Vulnerability to COVID-19 Is More Limited Than His Reply Suggests**

In his reply brief, Trenkler's counsel states that he "indisputably has cardiomyopathy now." Reply at 7. But that is exactly what is in dispute. As the Declarations of Dr. David Goldberg make clear, Trenkler's cardiomyopathy *has likely improved, if not fully reversed*. *See* Ex. 1 (Goldberg Decl. 2/7/21), ¶¶ 4-6, filed herewith; *see also* Dkt. 758, Ex. 4 (Goldberg Decl. 1/25/21) ¶ 9. This is because Trenkler's cardiomyopathy was likely caused by his dual chamber pacemaker. Dkt. 758, Ex. 4 ¶ 8. Dr. Goldberg reached this conclusion after noting that Trenkler's test results *ruled out* ischemic cardiomyopathy—contrary to the suggestion in Trenkler's reply brief, relying on the initial declaration from his expert hospitalist (not cardiologist) that Trenkler's cardiomyopathy was ischemic in origin. *See id.* ¶ 14 ("Following his echocardiogram, Mr. Trenkler underwent a

coronary angiogram that confirmed his cardiomyopathy was not ischemic in origin.").[1]  Further, Trenkler was not worked up for other causes of cardiomyopathy, suggesting that his doctors in Arizona also concluded his cardiomyopathy was pacemaker induced.  *Id.* ¶ 8.  For patients with pacing induced cardiomyopathy who receive a biventricular pacemaker, it is not just "possible," as Trenkler acknowledges, that his heart has improved, but *probable*.  Ex. 1 ¶ 5.  As Dr. Goldberg explained, "[a]pproximately 75% of patients with pacing induced cardiomyopathy see improvements in their ejection fraction within one year of upgrading to a biventricular pacemaker," and the "greatest improvement is seen in the first three months following implantation of a biventricular pacemaker, with improvements continuing over the course of the first year post-implantation."[2]  Dkt. 758, Ex. 4 ¶ 9; *see also* Ex. 1 ¶ 5.  Trenkler's biventricular pacemaker was implanted approximately eight months ago, and it is more than likely his cardiomyopathy has improved, if not reversed, during this time.[3]  Dkt. 758, Ex. 4 ¶ 9; Ex. 1 ¶ 5.  What is more, Trenkler's new pacemaker has a built-in defibrillator, further limiting potential risks from COVID-19.  Dkt. 758, Ex. 4 ¶ 6.

---

[1] Trenkler's expert, Dr. Morgan Esperance, appears to have backed away from this conclusion in her declaration submitted with Trenkler's reply brief.

[2] Trenkler's reply asserts that the government "misleadingly paints Mr. Trenkler as 'very fit.'"  Reply at 7-8, n.3.  But it is not the government who described him as "very fit," it was the outside doctors at Banner University Medical Center, Tucson.  Dkt. 758, Ex. 3 at 48.  What is more, even under the article Trenkler cited in his Reply describing the clinical frailty scale, Trenkler's rating of "very fit" is described as "[p]eople who are robust, active, energetic, and motivated.  These people commonly exercise regularly.  They are among the fittest for their age."  https://www.ncbi.nlm.nih.gov/books/NBK559009/.

[3] Trenkler would need to undergo an echocardiogram to confirm whether his cardiomyopathy has improved.  Ex. 1 ¶ 5; Dkt. 758, Ex. 4 ¶ 9.  That Trenkler is still taking medication for heart failure with reduced ejection fraction indicates only that he *had* cardiomyopathy prior to the implantation of his new pacemaker, and that he has not been tested since the implantation of his biventricular pacemaker to confirm whether he *still* has cardiomyopathy.  Ex. 1 ¶ 6.

Trenkler's reply brief also cites inaccurate statistics regarding current infection rates at USP Tucson. As noted in the Declaration of Shannon Bass, Dkt. 758, Ex. 2 n.1, the numbers of staff cases listed on the Bureau of Prison's website "is much greater than the current number of actively infected staff." As of February 8, 2021, the total number of cases at the entire Federal Correctional Complex in Tucson were: 4 inmates at the maximum-security penitentiary; 0 inmates at the medium-security correctional institution; 0 inmates at the minimum-security camp; and 1 staff member.[4] While the total number of COVID cases at USP Tucson—and indeed, the number of cases nationwide—is a tragedy, as Trenkler notes, the concern is his risk *now*, and currently, there is a minimal risk of exposure for Trenkler, particularly where staff (and some inmate) vaccinations have already occurred. *Id.* ¶ 84. Further, as noted in the Bass Declaration, Trenkler is Priority Level 2 for receiving the COVID-19 vaccine. *Id.* Accordingly, considering the totality of the circumstances, Trenkler has not met his burden for reducing his life-sentence under 18 U.S.C. § 3582(c)(1)(A).

## II. The Alleged Defects in Trenkler's Sentence Do Not Warrant Relief

Trenkler points to certain sentencing defects that he claims warrant the relief he seeks. He points, first, to the fact that this Court found that Trenkler acted with an intent to kill by a preponderance standard rather than beyond a reasonable doubt. Reply at 13. But, as noted in the government's Opposition brief, the First Circuit disposed of this issue in its reversal of the grant of *coram nobis*:

---

[4] Trenkler's suggestion that 75% of inmates at USP Tucson have been infected is misleading because it does not account for the fact that there have been more than 1,200 inmates at the facility since the start of the pandemic as inmates are released and others moved to the facility over the course of the past year, and many of the cases were from inmates newly transferred to USP Tucson that were contained in the 14-day entry quarantine all new inmates must undergo, and not through community spread within the facility.

> [Trenkler] does not charge that a life sentence is beyond the statutory maximum for the crimes of conviction. Rather, his claim is procedural: that the statutes of conviction required a jury recommendation in order to impose a life sentence, and that the judge, not the jury, made the recommendation in his case. This claim, if true, does not suggest a miscarriage of justice.
>
> *   *   *
>
> Rules that allocate decisionmaking authority between judge and jury are generally thought to be procedural. [Citations omitted]. As such, the misallocation of that responsibility is unlikely to implicate the accuracy or fundamental fairness of judicial proceedings.

Opp. at 10, citing *Trenkler v. United States,* 536 F.3d 85, 99 (1st Cir. 2008).

Trenkler also observes that Thomas Shay, Jr. was found not to have an intent to kill, "and given the theory of motive the government presented, it is difficult to see how a jury could have found, beyond a reasonable doubt, that *Trenkler* possessed an intent to kill." Reply at 13. But the short answer is that juries sometimes reach inconsistent verdicts. *See, e.g.*, *United States v. Bucuvalas*, 909 F.2d 593, 593-95 (1st Cir. 1990) (considering "effect of jury verdicts acquitting one alleged conspirator and convicting the sole other alleged conspirator on the same count in the same trial" and rejecting the premise that the acquittal necessarily represented a factual determination that proof beyond a reasonable doubt was lacking as to that defendant) (citing *Dunn v. United States*, 284 U.S. 390, 393-94 (1932), and *United States v. Powell*, 469 U.S. 57 (1984)). Here, this Court reached its different views at the sentencings of Shay, Jr. and Trenkler based in part on its recognition that Trenkler's jury convicted him of Count Two, which charged intent to kill, while Shay, Jr.'s jury found him not guilty of that charge.

Trenkler also maintains that his sentence would likely be different today in the absence of the pre-*Booker,* mandatory guidelines. Reply at 13-14. The government disagrees. In spite of positions that certain jurors have taken years after their verdict, the government believes it likely that the jury, in finding Trenkler responsible for a bomb that, in this Court's words, resulted in "a

4

horrendous crime" in which an "absolutely innocent person doing his job was literally blown apart and another seriously injured and maimed," Dkt. 758, Ex. 1 at 60, would have recommended that the Court impose a life sentence.  Nor does the government find it likely that this Court, (1) having been reminded of the trial evidence that the bomb in this case—which included at least two and as many as three sticks of dynamite—had been placed under the driver's seat of Shay, Sr.'s car; (2) having determined that the defendant intended that Shay, Sr. be killed; and (3) having denied a motion for a downward departure, would have sentenced Trenkler to anything short of life.  The case that Trenkler cites for his claim otherwise, *United States v. Parker*, 461 F.Supp.3d 966 (C.D. Cal. 2020), does not assist him, given that the defendant in *Parker* was convicted of drug offenses that, at the time, carried life sentences under the mandatory guidelines regime.  He did not make a bomb that killed one police officer, maimed another, and devastated two families.

### III. There Are No Profound Questions about Trenkler's Guilt That Support Release

Many of the questions Trenkler raises about the evidence of his guilt, Reply at 15-18, have been dealt with previously.  Trenkler's contention that neither of the theories the government advanced at trial for why he would commit this crime are valid, Reply at 15-16, merits further response.  At the outset, it bears noting that motive is not an element of any of the crimes of conviction, and thus whether the government correctly divined why Trenkler engaged in these offenses does not diminish the overwhelming evidence that he did.  *E.g. United States v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000).

In any event, the government vehemently denies that Trenkler's conviction "could only have been obtained in an atmosphere suffused with homophobia" or that the two well-respected prosecutors who tried the case suggested, *sotto voce* or otherwise, "that somehow gay men are capable of anything."  Reply at 2, 16.  While Trenkler's sexual orientation and relationship with

5

Shay, Jr. and other individuals were elicited during the trial, it was not for the purpose of suggesting that there was anything wrong with his sexual orientation. It was elicited in part to show that Trenkler and Shay, Jr. had a relationship that spanned several years. Indeed, it is hardly surprising that, in a case in which Trenkler was charged with building a bomb with the intent to kill Shay, Jr.'s father, the government needed to show a relationship between Shay, Jr. and Trenkler. The fact that many people saw the two together in a variety of settings over a period of time helped to prove that connection. This testimony was also elicited to show that Trenkler lied to law enforcement about how well, and for how long, he had known Shay, Jr.[5] An obvious inference to draw is that Trenkler wanted to minimize their relationship not because they were gay, but because they conspired to kill Shay, Sr. with a bomb.

Moreover, the Court took steps to ensure that the jury would not draw any inappropriate adverse inference from Trenkler's sexual orientation. As the transcript of Day 1 of Trenkler's

---

[5] Trenkler gave inconsistent statements to law enforcement about how long he had known Shay, Jr. and whether Shay, Jr. had ever been to Trenkler's apartment. For example, Trenkler told Special Agent Dennis Leahy when they first met on the night of November 4, 1991 going into the early morning of November 5, 1991, that he met Shay, Jr. in a White Hen Pantry in Boston and had given him a ride several times to the area of Trenkler's apartment but that Shay, Jr. had never been in his apartment in Quincy. [Day 11:50]. On January 31, 1992, when Special Agent Leahy was executing a search warrant, Trenkler showed up and, among other things, told Special Agent Leahy that Shay, Jr. had been in Trenkler's Quincy apartment once, to watch television, and that he had forgotten to tell Special Agent Leahy that he had spent the weekend with Shay, Jr. at Atell, a location in South Boston where Trenkler worked and had living quarters. [Day 11:63-64; Day 9:149]. On February 3, 1992, Trenkler called Special Agent Leahy, told him that he first met Shay, Jr. in June 1991, and that he had also given Shay, Jr. rides to Rhode Island and Winthrop. [Day 11:68-69].

Several witnesses provided a very different timeline. For example, Edward Carrion dropped Shay, Jr. off three or four times at a residence on White Lawn Avenue in Milton where he understood Trenkler resided. [Day 10:33-34]. He saw Trenkler twice. [*Id.*]. The first time Carrion dropped Shay, Jr. off at this location was in the spring of 1989. [*Id.*]. Edward Nutting saw Trenkler drop Shay, Jr. off at a location in the Blue Hills Reservation in the spring of 1991. [Day 10:93]. Richard Brown, Trenkler's business partner, saw Shay, Jr. at Trenkler's living quarters at Atell, which Trenkler vacated in around December 1990. [Day 9:149-54].

trial reveals, the Court asked each potential juror whether he or she either believed homosexual relations between consenting adults to be morally wrong and whether the potential juror's views of a witness's credibility would be influenced in any way by that witness's sexual orientation. [*E.g.* Day 1:31].[6]

Trenkler also takes issue with the theory that he could have been after a share of potential insurance proceeds from Shay, Sr.'s lawsuit. Reply at 17-18. And he is correct that there is no direct evidence that he knew about this potential source of revenue. As the Court is aware, Shay, Jr. refused to testify notwithstanding being granted immunity. Trenkler, for his part, exercised his absolute right under the Fifth Amendment not to testify. Having done so, however, the government had no ability to cross-examine his version of events, and the Court should place no reliance on his self-serving statements at his sentencing. *See* Reply at 17. In any event, given that Shay, Jr. made statements regarding the potential recovery to a total stranger, it is reasonable to infer he would have told Trenkler. [Day 9:44].[7]

Trenkler also argues, again, that this motive falls apart if Shay, Jr. did not intend to kill his father. But, as explained above, the conclusion reached by a different jury as to Shay, Jr. does not undermine *this* jury's finding as to Trenkler.

---

[6] Trenkler notes that a member of the jury panel who ended up on the jury expressed the view during *voir dire* that she believed homosexual relations between consenting adults was morally wrong, but she also said "but that's their own, that's their own private lives." [Day 1:61]. She also answered "No" to the question, "would your views of a witness's credibility or a defendant's guilt be in any way influenced by that person's sexual orientation?" [*Id.*].

[7] Shay, Jr. told Lawrence Plant in October 1992, when both were being held at the Plymouth House of Correction, that he hated his father; that he wanted to "get even" with his father; that this plan included putting a bomb under his father's car with magnets that ended up falling off; that it killed one officer and maimed another; and that "[t]here was some sort of life insurance policy worth somewhere around half a million dollars." [Day 9: 42-44].

7

In the introduction to the Reply Trenkler also suggests other bases for doubting either the evidence or his guilt, most of which were either dealt with in the Opposition or above. One bears comment here, however: it is Trenkler's complaint that the ATF agents did not "bother" to take the sketch he provided on November 4, 1991, when, after Trenkler had provided a sketch of the destructive device he admitted making in Quincy in 1986, Special Agent D'Ambosio asked him to tell him how the wiring one would use to make a bomb utilizing a remote control device but with dynamite instead of a "large firecracker" would be different. [Day 10:124]. Both Special Agent D'Ambrosio and Special Agent Leahy were there at the time and saw the defendant sketch a bomb that employed two sticks of dynamite and two blasting caps to detonate the dynamite. [*Id.*]. This was highly significant because evidence recovered from the scene of the explosion revealed that at least two blasting caps had been used and this information had not been made public. [Day 11:48-49]. The government does not understand Trenkler to be claiming that the agents lied about the sketch, and the improbability of two agents doing so renders that a sound decision. The bottom line is that while Special Agent D'Ambrosio testified that it was an oversight not to have taken the sketch [Day 10:128], the evidence shows both that the defendant made it and its significance.

### IV.     The § 3553(a) Factors Weigh Against an Early Release

Trenkler contends that this Court has already considered the § 3553(a) factors in resentencing him to 37 years after granting his *coram nobis* petition. But the government disagrees: the Court allowed the petition and resentenced Trenkler because the Court erroneously thought there was a fundamental defect in the original sentencing. The First Circuit disagreed. The government demonstrated in the Opposition that the § 3553(a) factors all militate against granting Trenkler's motion, and nothing has changed to alter that calculus.

**CONCLUSION**

Dr. Goldberg's declarations show that it is likely that Trenkler's cardiomyopathy has been reversed. While the government does not say so "blithely," the statistics from Tucson show that Trenkler's risk of contracting COVID are greatly reduced. And the § 3553(a) factors weigh heavily against relief. Accordingly, the Court should deny Trenkler's motion.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ Robert E. Richardson
ROBERT E. RICHARDSON
KRISTEN A. KEARNEY
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be served on counsel of record as listed in the NEF.

Dated: February 12, 2021                    /s/ Robert E. Richardson
                                            Robert E. Richardson