UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                                  )
UNITED STATES OF AMERICA          )
                                  )
     v.                           )     Cr. No. 92-10369 WES
                                  )
ALFRED W. TRENKLER,               )
                                  )
                 Defendant.       )
_____  )
```

## OPINION AND ORDER

Defendant Alfred Trenkler is a sixty-five-year-old federal inmate serving a life sentence for convictions stemming from his role in an October 28, 1991 bombing in Roslindale, Massachusetts that killed one Boston Police Department Bomb Squad officer and maimed a second officer.  On November 29, 1993, a jury convicted Trenkler of illegal receipt and use of explosive materials and attempted malicious destruction of property by means of explosives, in violation of 18 U.S.C. §§ 844(d), 844(i) (Counts 2 and 3), and conspiracy, in violation of 18 U.S.C. § 371 (Count 1). See Jury Verdict, ECF No. 487.  Trenkler is currently incarcerated at the U.S. Penitentiary in Tucson, Arizona ("USP Tucson").

Defendant moves for compassionate release, asserting that extraordinary and compelling circumstances warrant his release based on (1) the COVID-19 pandemic, particularly in light of his documented heart condition and the outbreak that has left at least 1009 inmates infected with COVID-19 over the past year at USP

Tucson[1]; and (2) what Trenkler characterizes as a series of miscarriages of justice that call into question his convictions and sentence.  See generally Def.'s Emergency Mot. for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and Mem. of Law in Supp. ("Def.'s Mot."), ECF No. 744.[2] For the reasons set forth below, Trenkler's Motion is GRANTED IN PART AND DENIED IN PART.  The Court reduces Trenkler's sentence to a term of 41 years, followed by a term of supervised release of 3 years on Count 1, 5 years on Count 2, and 5 years on Count 3, all to run concurrently.

## I.   BACKGROUND

On November 29, 1993, following an eighteen-day trial, a jury convicted Trenkler on the three counts charged.  See Jury Verdict. The government's theory at trial was that Trenkler, along with his co-defendant, Thomas Shay, Jr., conspired to build and place a bomb under a vehicle belonging to Shay, Jr.'s father, Thomas Shay, Sr., with the intent to kill Shay, Sr.  United States v. Trenkler,

---

[1]   See Compassionate Release Work:  Graphing COVID Cases in the Bureau of Prisons, https://law.uiowa.edu/compassionate-release-work (reflecting a significant outbreak of COVID-19 cases at USP Tucson in October 2020 through December 2020) (last visited May 5, 2021).

[2]   In the normal course, a compassionate release motion is assigned to the district court judge who presided over the defendant's sentencing.  See 18 U.S.C. § 3582(c).  Here, presumably to avoid the appearance of a conflict of interest, the matter was reassigned to an out-of-district judge, the undersigned, sitting by designation.

61 F.3d 45, 47-48 (1st Cir. 1995) ("<u>Trenkler I</u>"). The bomb accidentally detonated after officers from the Boston Police Department Bomb Squad were called to the scene by Shay, Sr., resulting in a horrendous scene that took the life of one officer and severely injured another. <u>Id.</u> at 48; <u>see also</u> Trenkler Jury Trial Day 2 Tr. 48-52, Ex. 1 to Def.'s Reply, ECF No. 763-1. Shay, Jr.'s motive, the government argued, was the prospect of inheriting $400,000 in insurance proceeds that Shay, Sr. stood to recover from a pending lawsuit. Trenkler Jury Trial Day 2 Tr. 15. The government speculated that Trenkler participated in the scheme in hopes of either seducing Shay, Jr. as a lover or recovering some of the insurance proceeds for himself.[3] <u>Id.</u> at 25.

At trial, the government introduced circumstantial evidence tying Trenkler to the bomb. This included evidence that Trenkler fashioned a remote-control explosive device in Quincy, Massachusetts in 1986 (the "Quincy device") with similar features, <u>Trenkler I</u>, 61 F.3d at 48; printouts from a law enforcement database (the "EXIS database") that purported to demonstrate that the Quincy device was a close match to the Roslindale bomb, <u>id.</u> at

---

[3] Trenkler argues that homophobia permeated his trial. Def.'s Reply 2, ECF No. 763. Indeed, a review of the trial record shows that the prosecution arguably focused on Trenkler's sexuality more than was necessitated by the legitimate purpose of establishing the basis for his relationship with Shay, Jr. <u>See</u> <u>id.</u> at 15-16 n.8. This perception is also reflected in several letters from jurors discussed later in this Opinion. <u>See</u> Def.'s Submission of Juror Letters, ECF No. 777.

57-61; Trenkler's statement to an officer investigating the Roslindale bomb that "if we did it, then only we know about it . . . how will you ever find out . . . if neither one of us talk[]?", id. at 60 (alteration in original); evidence that Trenkler had electronics and explosives knowledge, id.; Trenkler's relationship with Shay, Jr., id.; and Trenkler's jail-cell confession to cellmate David Lindholm, id. Lindholm and Trenkler shared a jail cell at Plymouth House of Corrections in December 1992. During the four days they roomed together, Lindholm testified, the two inmates "gradually 'bonded' upon discovering that they came from the same home town and had similar backgrounds." Id. at 50. Lindholm further testified that, while Trenkler initially denied his guilt, in time he admitted to building the Roslindale bomb. Id. at 51. Other than Trenkler's confession to Lindholm, there was no direct evidence supporting Trenkler's conviction. See Trenkler Sentencing Hr'g Tr. (Mar. 8, 1994) at 59, Ex. 1 to Gov't Opp'n, ECF No. 758-1 (noting the lack of direct evidence).

On March 8, 1994, the district court[4] sentenced Trenkler to concurrent terms of life imprisonment on Counts 2 and 3 (receipt of explosive materials and attempted malicious destruction of

---

[4] In this Opinion, the trial court judge, U.S. District Judge Rya Zobel, is referred to either as the district court or Judge Zobel for clarity and readability.

property by means of explosives), as well as a concurrent term of 60 months on Count 1 (conspiracy).[5]   See ECF No. 552.   In formulating the basis for Trenkler's sentence, the district court found that Trenkler had intended to kill Shay, Sr. when Trenkler placed the bomb under the driver's seat of Shay, Sr.'s car.   See Trenkler Sentencing Hr'g Tr. (Mar. 8, 1994) at 27-28.

Throughout the history of this case, Trenkler has maintained his innocence and pursued nearly every plausible avenue of relief. See Trenkler Disposition (Mar. 8, 1994) Tr. 31-59, ECF No. 763-2 (Trenkler proclaiming his innocence during his allocution).   In July 1995, the First Circuit affirmed Trenkler's conviction on direct appeal.   See Trenkler I, 61 F.3d at 59.   The court held that the district court had erred in admitting evidence from the EXIS database to establish the identity of the bombmaker, because that evidence was unreliable.   Id.   Over Judge Torruella's strong

---

[5] Shay, Jr. was tried on the same three Counts as Trenkler. He was sentenced to concurrent terms of 188 months' and 60 months' imprisonment, after a jury convicted him on Counts 1 and 3 and acquitted him on Count 2.   ECF No. 351.   Importantly, Count 2, charging receipt of explosive materials, was the only count that included intent to kill language.   Presuming the jury had rejected the premise that Shay, Jr. intended to kill his father, the district court noted at sentencing that it determined the applicable guideline was that for second-degree murder.   See Shay, Jr. Sentencing Hr'g Tr. (Oct. 8, 1993) at 103, 131, 135, Ex. 6 to Gov't Opp'n, ECF No. 758-6.   The First Circuit overturned Shay, Jr.'s conviction on appeal, and, on remand, Shay, Jr. pleaded guilty and was sentenced to 144 months' imprisonment, after receiving credit for acceptance of responsibility.   ECF No. 631. In September 2007, he wrote to the district court declaring Trenkler's innocence.   See ECF No. 709.

dissent, the panel concluded the error was harmless and affirmed Trenkler's conviction.  <u>Id.</u> at 59-60, 62.  Thereafter, Trenkler filed several motions for new trial and to vacate under 28 U.S.C. § 2255.  None resulted in relief.

In 1998, the First Circuit affirmed the trial court's denial of Trenkler's motion for new trial, <u>see</u> <u>United States v. Trenkler</u>, No. 97-1239, 1998 WL 10265 (1st Cir. Jan. 6, 1998) ("<u>Trenkler II</u>"), and in 2001, the First Circuit affirmed the denial of Trenkler's motion under 28 U.S.C. § 2255.  <u>See</u> <u>Trenkler v. United States</u>, 268 F.3d 16 (2001) ("<u>Trenkler III</u>").  The Third Circuit, in 2003, affirmed the U.S. District Court for the Middle District of Pennsylvania's denial of Trenkler's petition for writ of habeas corpus while Trenkler was incarcerated at the United States Penitentiary at Allenwood.  <u>See</u> <u>Trenkler v. Pugh</u>, 83 Fed. App'x 468 (2003) ("<u>Trenkler IV</u>").

Undeterred by these setbacks, Trenkler conducted his own legal research and, in 2005, discovered a new issue, which he raised in a letter to the district court.  <u>See</u> Ltr from A. Trenkler to U.S. District Judge Zobel, ECF No. 668.  The district court, recognizing that Trenkler's discovery was important, appointed counsel.  In 2007, Trenkler filed a petition for writ of coram nobis.  In his petition, Trenkler asserted – for the first time – that at the time of his sentencing, 18 U.S.C. §§ 844(d) and (i) provided for the imposition of a life sentence only "if the jury

shall in its discretion so direct." See Trenkler v. United States, No. 06-12072-RWZ, 2007 WL 551620 (D. Mass. Feb. 20, 2007) ("Trenkler V") (quoting 18 U.S.C. § 34, as incorporated by 18 U.S.C. § 844 (1993)). Apparently, no one – not defense counsel, the government, U.S. Probation, nor the district court – was aware of this statutory edict, and it was never raised prior to or at sentencing. Id. at *2-3. As a result, Judge Zobel had sentenced Trenkler in 1994 to life imprisonment with no input from the jury.[6]

Trenkler's appellate and post-conviction relief attorneys had also missed the issue over the ensuing years. Judge Zobel, acknowledging this fundamental oversight, concluded that she had imposed a sentence that only a jury could impose under the statute, and that such circumstances were sufficiently "extraordinary" to warrant coram nobis relief. Id. at *6. She set aside Trenkler's sentence and set the matter down for resentencing, where Trenkler, the surviving victim, and the victims' families were all present.

At resentencing, Judge Zobel noted the jury verdict included an explicit finding that the offense conduct had directly and proximately caused the death of one police officer and the serious personal injury of a second and, that while she had found this translated into first degree murder in the first sentencing, she was now prohibited from making such a finding. She further stated

---

[6] Six months after Trenkler's sentencing, the statute was amended, and it now allows a judge alone to impose a life sentence.

that in reaching a guilty verdict on Count 2 the jury was asked whether Trenkler had used explosive material to kill, injure, or intimidate Shay, Sr., or to cause property damage. By answering that broad question in the affirmative, the verdict on Count 2 could only support a finding that Trenkler had the intent to cause property damage, with death resulting. Trenkler Resentencing Hr'g (Apr. 4, 2007) Tr. 60:8-15, 60:18-22, 61:13-18, 62:2-5, ECF No. 758-5. Judge Zobel then imposed a term of 37 years, which she noted was Trenkler's life expectancy at the time of his original sentencing, on Counts 2 and 3, and a term of 5 years on Count 1, all to be served concurrently. Id. at 62:17-19.[7]

But Trenkler's partial victory was fleeting. The First Circuit reversed the district court's order granting the writ of coram nobis, quashed the writ, vacated the amended judgment, and reinstated the life sentences, concluding that Trenkler's petition for a writ of coram nobis was in effect a veiled and untimely motion to vacate his sentence under § 2255. Trenkler v. United

---

[7] Undergirding this sentence were two things. First, the Sentencing Guidelines calculations refer the Court to § 2A1.1 and set the offense level at 43, for which the range is Life. Offense level 42, one level below the offense level for felony murder, at Criminal History Category I, has a range of 360 months to Life. As discussed infra, the Application Note to U.S.S.G. § 2A1.1 directs a district court to consider the facts of the underlying offense in assessing the appropriate reduction in a felony murder case. See U.S.S.G. § 2A1.1 cmt. n.2(B). Second, the prevailing case law at the time made clear that where a judge could not legally impose a life sentence, she should not exceed Defendant's life expectancy in imposing a term of years. See infra n.18.

States, 536 F.3d 85, 97-98 (1st Cir. 2008) ("Trenkler VI").  As such, the court reasoned, the district court lacked jurisdiction to entertain Trenkler's claim where he had not established a "complete miscarriage of justice" – such as actual innocence.  Id. at 99.  In the court's view, a procedural error of the sort complained of "d[id] not suggest a miscarriage of justice."  Id. The First Circuit did not dispute Judge Zobel's holding that Trenkler's life sentence was unlawfully imposed by a judge not a jury; instead, the court concluded that the error was procedural in nature and therefore did not affect Trenkler's "substantial rights."  Id. at 100.[8]

Front and center in Trenkler VI was the tension between the virtue of finality lauded by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and a system of justice that corrects established errors – indeed, the First Circuit noted that "our criminal justice system tolerates a certain risk of error".  Id.

---

[8] In September 2007, shortly after Judge Zobel resentenced Trenkler, but before the First Circuit reinstated his life sentence, the First Circuit granted Trenkler leave to file a second or successive motion under 28 U.S.C. § 2255.  See J., Appeal No. 07-2112 (1st Cir. Sept. 6, 2007).  Judge Zobel carefully reviewed, and rejected, Trenkler's six grounds for relief.  See generally Trenkler v. United States, Civil Action No. 07-11823-RWZ, slip op. (D. Mass. Mar. 16, 2009).  As for actual innocence, Judge Zobel concluded that Trenkler had not demonstrated that it was more likely than not that "no reasonable juror would have convicted him in light of the new evidence".  Id. at 16-19.  The First Circuit affirmed this holding in Trenkler v. United States, Appeal No. 09-1559, slip op. (1st Cir. June 8, 2010).

But little in life is actually final.  In AEDPA, Congress spoke to the virtue of finality and constrained the number of attempts a defendant has to challenge his conviction and sentence; twenty-plus years later, Congress has directed, through the First Step Act, that the district court should use its discretion to either grant compassionate release or reduce a sentence where the movant establishes "extraordinary and compelling" circumstances and the 18 U.S.C. § 3553 sentencing factors weigh in favor of release.  United States v. McCoy, 981 F.3d 271, 288 (4th Cir. 2020) (noting that "§ 3582(c)(1)(A) 'represents Congress's judgment that the generic interest in finality must give way in certain individual cases,' and authorizes judges to implement that judgment" (quoting United States v. Jones, 482 F. Supp. 3d 969, 980–81 (N.D. Cal. 2020)).

## II.  DISCUSSION

### A.   The Legal Standard:   Compassionate Release under the First Step Act

The compassionate release statute, 18 U.S.C. § 3582(c), as amended by the 2018 passage of the First Step Act, allows a defendant to directly petition the district court in which he was sentenced for compassionate relief.  See id.  Section 3582(c)(1)(A) states in pertinent part:

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

motion on the defendant's behalf or the lapse of 30 days
from the receipt of such a request by the warden of the
defendant's facility, whichever is earlier, may reduce
the term of imprisonment (and may impose a term of
probation or supervised release with or without
conditions that does not exceed the unserved portion of
the original term of imprisonment), after considering
the factors set forth in section 3553(a) to the extent
that they are applicable, if it finds that —
(i) extraordinary and compelling reasons warrant such a
reduction
...
and that such a reduction is consistent with <u>applicable</u>
policy statements issued by the Sentencing Commission[.]

Id. (emphasis added).   Since its enactment as part of the

Sentencing Reform Act of 1984, § 3582(c)(1)(A) has not "define[d]

— or place[d] any limits on — what 'extraordinary and compelling

reasons' might warrant such a reduction."    <u>United States v.</u>

<u>Vigneau</u>, 473 F. Supp. 3d 31, 33 (D.R.I. 2020) (citations omitted).[9]

---

[9]  Indeed, § 3582(c)(1)(A)'s legislative history suggests
Congress intended courts to have broad discretion in defining the
term "extraordinary and compelling reasons."   As part of
the Comprehensive Crime Control Act of 1984, of which the
Sentencing Reform Act was a part, Congress abolished the federal
parole system.    In an effort to maintain a system that could
respond to changed circumstances in a determinate sentencing
regime, Congress shifted discretion away from the parole board to
the courts.  S. Rep. No. 98-225 at 52-56.   Specifically, in the
Senate Report accompanying the bill, the Senate Committee stated,
in pertinent part:

   The Committee believes that there may be unusual cases
   in which an eventual reduction in the length of a term
   of imprisonment is justified by changed circumstances.
   Those would include cases of severe illness, <u>cases in
   which other extraordinary and compelling circumstances
   justify a reduction of an unusually long sentence</u>, and
   some cases in which the Sentencing Guidelines for the
   offense of which the defender was convicted have been
   later amended to provide a shorter term of imprisonment

Congress instead authorized the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  Though this edict was codified in 1984, the Sentencing Commission did not promulgate a policy statement on compassionate release until 2006.  See United States v. Jones, 980 F.3d 1098, 1104 (6th Cir. 2020).  To this day, the only limit Congress has placed on what may constitute extraordinary and compelling reasons is that "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t)).

**Policy Statement U.S.S.G. § 1B1.13.**  In 2006, the Sentencing Commission promulgated U.S. Sentencing Guidelines § 1B1.13, which sets forth the Commission's policy statement on compassionate release motions filed by the Director of the Bureau of Prisons.

---

. . . . The Bill, as reported, provides . . . in proposed 18 U.S.C. 3583(c) for court determination, subject to consideration of sentencing commission standards, of the question whether there is justification for reducing a term of imprisonment in situations such as those described.

S. Rep. No. 98-225, 55-56 (1983) (emphasis added); see also Shon Hopwood, Second Looks & Second Chances, 41 Cardozo L. Rev. 83, 100-102 (2019) (detailing the origins of the compassionate release statute in the abolition of the parole system and the accompanying shift of "second looks" from the parole commission to the judiciary); S. Rep. 98-225 at 121 (describing § 3583 as providing "safety valves", including to "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons'").

12

U.S.S.G. § 1B1.13; see also United States v. Brooker, 976 F.3d
228, 232 (2d Cir. 2020) (detailing the 2007 and 2018 amendments to
§ 1B1.13).  In its current iteration, which was last amended in
2018, § 1B1.13 largely restates the standard in 18 U.S.C.
§ 3582(c), but also adds the requirement that, before granting a
motion for compassionate release, a court must find that "[t]he
defendant is not a danger to the safety of any other person or to
the community, as provided in 18 U.S.C. § 3142(g)[.]"  U.S.S.G.
§ 1B1.13(2).

In the Application Notes to § 1B1.13, the Sentencing
Commission expanded upon the meaning of "extraordinary and
compelling reasons" by setting forth four categories of
circumstances that qualify.  The first three are a defendant's (1)
medical condition, (2) age, and (3) family circumstances.  See
U.S.S.G. § 1B1.13 cmt. n. 1(A)-(C).  The fourth is a catch-all
clause which states:  "[a]s determined by the Director of the
Bureau of Prisons," an extraordinary and compelling reason may
exist for reasons "other than, or in combination with" the
defendant's medical condition, age, and/or family circumstances.
U.S.S.G. § 1B1.13 cmt. n. 1(D).

Application Note 4 to § 1B1.13, titled "Motion by the Director
of the Bureau of Prisons" and added in 2016, states in part that
"[a] reduction under this policy statement may be granted only
upon motion by the Director of the Bureau of Prisons pursuant to

13

18 U.S.C. § 3582(c)(1)(A)."  U.S.S.G. § 1B1.13 cmt. n. 4.  It further acknowledges that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction) . . . ."  Id.

**The First Step Act.**  In 2018, the First Step Act was signed into law.  Characterized as the "culmination of several years of congressional debate about what Congress might do to reduce the size of the federal prison population while also creating mechanisms to maintain public safety", Timothy A. Scott & Larry A. Burns, Ninth Circuit Criminal Handbook § 14.18[3] (2020), the First Step Act reduces or eliminates mandatory minimums for several offenses, expands the use of the so-called safety valve provision in sentencing, and affords additional opportunities for prisoners to earn good time credit, among other criminal justice reforms.  Vigneau, 473 F. Supp. 3d at 35.  Relevant here, § 603(b) of the First Step Act amended the compassionate release statute "to increase the use and transparency of compassionate release."  Id. (citing Section 603(b) of the First Step Act, titled "Increasing the Use and Transparency of Compassionate Release")); see also Jones, 980 F.3d at 1104 ("Frustrated with the BOP's conservative approach, a bipartisan coalition in Congress sought to boost grants of compassionate release by reforming § 3582(c)(1)(A)'s procedures in the First Step Act of 2018.").  Consistent with this goal, the statute was amended to allow inmates to file motions for

compassionate release directly with their sentencing courts; they no longer need the Bureau of Prisons to file the motion on their behalf. <u>Vigneau</u>, 473 F. Supp. 3d at 34 (citing 18 U.S.C. § 3582(c)(1)(A)); <u>see also</u> <u>Jones</u>, 980 F.3d at 1104 (noting that "[f]or thirty-four years, only the BOP's Director could file motions for compassionate release").

The Sentencing Commission has not amended § 1B1.13 since the First Step Act was enacted. Nor has the Sentencing Commission promulgated additional policy statements addressing defendant-filed motions for compassionate release. <u>See</u> <u>United States v. Ebbers</u>, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020) (describing the policy statement contained in U.S.S.G. § 1B1.13 as "at least partly anachronistic"). And, it is unlikely that the Commission will amend the policy statement in the near future because it does not currently have a quorum of voting members. <u>Brooker</u>, 976 F.3d at 234.

The plain text of § 1B1.13 does not apply to defendant-filed motions for compassionate release. Indeed, the statement's introduction exclusively references "motion[s] of the Director of the Bureau of Prisons" and makes no reference to motions filed by inmates. <u>See generally</u> U.S.S.G. § 1B1.13. Moreover, as noted above, Application Note 1(D) to U.S.S.G. § 1B1.13, the catch-all provision, states that release may be appropriate when, "[a]s determined by the Director of the Bureau of Prisons, there exists

15

in the defendant's case an extraordinary and compelling reason
other than, or in combination with" the defendant's medical
condition, age, and/or family circumstances.  Thus, § 1B1.13 and
its Application Notes are now inconsistent with the text of
§ 3582(c)(1)(A); as written, § 1B1.13 pertains only to motions
filed by the Director of the Bureau of Prisons.  See generally
U.S.S.G. § 1B1.13; see also Brooker, 976 F.3d at 235-36 (reading
"the Guideline as surviving [the First Step Act], but now applying
only to those motions that the BOP has made").

    This Court agrees with the Second, Fourth, Fifth, Sixth,
Seventh, Ninth, and Tenth Circuits, as well as the majority of
district courts to have considered the issue, in holding that a
district court need not defer to § 1B1.13 when ruling on an inmate-
filed motion for compassionate release.  See Jones, 980 F.3d at
1109 (concluding that § 1B1.13 is "inapplicable" to inmate-filed
motions); see also Brooker, 976 F.3d at 234; United States v.
Shkambi, 993 F.3d 388 (5th Cir. 2021)(holding that "neither the
policy statement nor the commentary to it binds a district court
addressing a prisoner's own motion under § 3582," and a district
court "is bound only by § 3582(c)(1)(A)(i) and, as always, the
sentencing factors in § 3553(a)"); United States v. Gunn, 980 F.3d
1178, 1181 (7th Cir. 2020); United States v. Aruda, No. 20-10245,
2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) (concluding that
"U.S.S.G. § 1B1.13 may inform a district court's discretion

for § 3582(c)(1)(A) motions filed by a defendant" but it is not binding); McCoy, 981 F.3d at 284; United States v. Maumau, No. 20-4056, 2021 WL 1217855, at *12 (10th Cir. Apr. 1, 2021); Vigneau, 473 F. Supp. 3d at 35–36 (collecting cases).  But see United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *2 (D. Me. July 11, 2019) (collecting cases taking the opposing view).  More specifically, this Court follows the Second, Fourth, Fifth, Sixth, and Tenth Circuits in concluding that the policy statement is inapplicable to a defendant-filed motion.  See Brooker, 976 F.3d at 234; Jones, 980 F.3d at 1109; Shkambi, 993 F.3d at 388; McCoy, 981 F.3d at 284; Maumau, 2021 WL 1217855, at *12.[10]  Because § 1B1.13 is not applicable where an inmate files a motion on his own behalf, "[u]ntil the Sentencing Commission updates [the policy statement] to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."

---

[10] The Seventh Circuit in United States v. Gunn, and the Ninth Circuit in United States v. Aruda, suggest that even if not binding, the policy statement could be useful as a guide to district courts in considering compassionate release motions.  See United States v. Gunn, 980 F.3d 1178, 1181 (7th Cir. 2020); see also United States v. Aruda, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021).  The Court's conclusion in this Opinion and Order would not be different had it looked to § 1B1.13 to inform its decision because, in the Court's view, the sentencing error discussed below readily falls within the catch-all provision.  See U.S.S.G. § 1B1.13 cmt. n. 1(D).

Jones, 980 F.3d at 1109; see also Maumau, 2021 WL 1217855, at *12 (concluding that "Congress did not, by way of § 994(t), intend for the Sentencing Commission to exclusively define the phrase 'extraordinary and compelling reasons,' but rather for the Sentencing Commission to describe those characteristic or significant qualities or features that typically constitute 'extraordinary and compelling reasons,' and for those guideposts to serve as part of the general policy statements to be considered by district courts" in applying § 3582(c)(1)(A)).

With this in mind, the Court proceeds by undertaking the useful three-part inquiry set forth by the Sixth Circuit in Jones. See Jones, 980 F.3d at 1107-08. Under 18 U.S.C. § 3582(c), once a defendant demonstrates that he has exhausted the Bureau of Prisons' administrative process for compassionate release, or thirty days have lapsed without a decision, whichever occurs first, a district court may reduce the defendant's sentence provided that the court determines: (1) extraordinary and compelling reasons warrant the reduction; (2) any reduction is consistent with applicable Sentencing Commission policy statements; and (3) the sentencing factors outlined in 18 U.S.C. § 3553(a) weigh in favor of release. Id. Where the motion for compassionate release was filed by an inmate, as in this case, the court "may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy

18

statement § 1B1.13." <u>Id.</u> at 1111.  And, of course, the defendant carries the burden on a motion for compassionate release.  <u>Ebbers</u>, 2020 WL 91399, at *4.

Courts have broad discretion to determine what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A). Indeed, "district courts are empowered . . . to consider <u>any</u> extraordinary and compelling reason for release that a defendant might raise," <u>McCoy</u>, 981 F.3d at 281-82 (quotation and citation omitted), short of the statutory prohibition against looking to rehabilitation alone, <u>see</u> 28 U.S.C. § 994(t).

**B.   Exhaustion of Administrative Remedies**

Trenkler petitioned the USP Tucson Warden in May and November of 2020 and received two letters in response denying his requests for compassionate release.  <u>See</u> Ltr from Warden Rardin dated June 4, 2020, ECF No. 744-3; Ltr from Warden Colbert dated Jan. 13, 2021, ECF No. 754-1.  The Court finds that Trenkler has exhausted his administrative remedies as contemplated by 18 U.S.C. § 3582(c).

**C.   Extraordinary and Compelling Circumstances**

**1.   COVID-19 and Trenkler's Medical Condition**

Trenkler contends that extraordinary and compelling circumstances exist warranting immediate release because he suffers from severe cardiac disease, which puts him at increased risk of serious illness and death were he to contract COVID-19. Def.'s Mot. 1.  The government initially took the position that

Trenkler's medical condition constituted extraordinary and compelling circumstances in light of the COVID-19 pandemic, but it opposed granting relief in this particular case. See Gov't Opp'n 7, ECF No. 758 (stating that Trenkler's heart conditions "under current CDC guidelines, make him at risk of severe illness from COVID-19, which, under current guidance from the Department of Justice, is an 'extraordinary and compelling circumstance'"). The government has changed its position and now asserts that there exist no compelling and extraordinary circumstances because Trenkler received his first dose of the Moderna vaccine for COVID-19 on April 20, 2021. See Not. re: Gov't Position on "Binary Choice" Issue 2, ECF No. 801; see also Not. of Vaccination, ECF No. 800.[11]

In support of his Motion, Trenkler offers the Declarations of Drs. Morgan Esperance and AbdulRasheed Alabi. See Decl. of Morgan C. Esperance, MD MPH ("Esperance Decl.") ¶ 6, Ex. 6 to Def.'s Mot., ECF No. 744-5; see also Supp. Decl. of Morgan C. Esperance, MD MPH ("Supp. Esperance Decl."), Ex. 3 to Def.'s Reply, ECF No. 763-3; Decl. of AbdulRasheed A. Alabi, MD, PhD ("Alabi Decl."), Ex. 1 to Def.'s Notice of Rebuttal Expert Opinion of Cardiologist, ECF No. 775-1. Dr. Esperance is a hospitalist who is board certified in

---

[11] The BOP first offered Trenkler a vaccine on March 18, 2021, and he declined it. See generally Gov't Revised Position, ECF No. 792.

internal medicine.  Esperance Decl. ¶¶ 1, 3.  She is employed by Brigham and Women's Hospital and has cared for patients at risk for and infected with COVID-19 since March 2020.  Id. ¶¶ 3, 4. Dr. Esperance reviewed Trenkler's medical records from his hospital stays in June and July of 2020 following a pacemaker malfunction, and she opines that he suffers from "a number of serious, interrelated cardiac conditions." Id. ¶ 6.  In June 2020, Trenkler was diagnosed with heart failure with decreased ejection fraction.  Id. ¶¶ 6a, 20.  In addition, Trenkler had coronary artery disease, ischemic cardiomyopathy, and complete heart block. Id. ¶¶ 6b-6d.  He also has a twenty-pack-year history of cigarette smoking.  Id. ¶ 6e.[12]  Dr. Esperance concluded that Trenkler's cardiac conditions "pose a major risk to his survival even with optimal medical management." Id. ¶ 8.

Trenkler also offers the expert opinion of cardiologist AbdulRasheed A. Alabi, MD, PhD.  See generally Alabi Decl.  Dr. Alabi, a medical doctor certified in internal medicine, is employed by Massachusetts General Hospital ("MGH") and Harvard Medical

---

[12] A "pack year" is a unit used to quantify a person's smoking history.  A single pack year is equal to "smoking an average of one pack of cigarettes per day for one year."  A twenty-pack-year history would be the equivalent of smoking one pack of cigarettes per day for twenty years or two packs per day for ten years.  See Centers for Disease and Control Prevention, Who Should be Screened for          Lung          Cancer?, https://www.cdc.gov/cancer/lung/basic_info/screening.htm   (last visited May 5, 2021).

School as a clinical and research fellow in cardiovascular medicine.  Id. ¶¶ 1, 3.  Dr. Alabi also works at MGH in inpatient services.  Id. ¶ 3.  In that role, since the COVID-19 pandemic started, Dr. Alabi has "directly managed or supervised the care of hundreds of patients with COVID-19," most of whom were in the intensive care unit.  Id. ¶ 4.

Dr. Alabi opines that Trenkler is at heightened risk for hospitalization and death from COVID-19 due to his heart conditions, hypertension, smoking history, and overweight-to-obese body mass index (ranging from 29 to 31 kg/m$^2$).  Id. ¶¶ 11-12. Consistent with Dr. Esperance's opinion, Dr. Alabi concludes that Trenkler has an intermittent complete heart block.  Id. ¶ 7. Putting a finer point on it, Dr. Alabi notes that the circumstances surrounding Trenkler's heart block are "highly suggestive of an association with progressive heart diseases including worsening cardiomyopathy and heart failure".  Id. ¶ 12.  Dr. Alabi finds that there is insufficient reason to conclude that Trenkler's cardiomyopathy is pacemaker induced.  Id.  Moreover, Trenkler has a history of clinical symptoms and electrocardiographic signs consistent with progressive heart failure, which is independent but interrelated to the cardiomyopathy.  Id.  Trenkler's cardiovascular disease profile, in Dr. Alabi's view, suggests he would "likely continue to have a risk of severe decompensation" were he subjected to a physiological stress such as COVID-19.  Id.

In sum, Dr. Alabi views Trenkler's heart failure as likely significant and ongoing, exposing him to a heightened risk of sudden cardiac death.  Id. ¶ 8.  In addition, Dr. Alabi concludes that Trenkler's heart conditions, smoking history, hypertension, and BMI place him at heightened risk of hospitalization and death from COVID-19.  Id. ¶¶ 11-12.

The government counters with the opinions of Dr. David Goldberg.  See Decl. of David J. Goldberg, M.D., FACC, FSCAI ("Goldberg Decl.") (Jan. 25, 2021), ECF No. 758-4; Decl. of David J. Goldberg, M.D., FACC, FSCAI ("Goldberg Supp. Decl.") (Mar. 29, 2021), ECF No. 788.  Dr. Goldberg is a board-certified cardiologist with over twenty years' experience.  Goldberg Decl. ¶¶ 1-2.  He serves as the Medical Director of the Cardiac Catheterization Laboratory and Regional Network Development Physician for Steward Healthcare.  Id.  Dr. Goldberg opines that Trenkler's "coronary artery disease is very minor", he "may no longer have cardiomyopathy", and "[f]urther testing would need to be conducted to confirm" his current condition.  See id. ¶¶ 9, 10; Goldberg Supp. Decl. ¶ 5 (stating that "the only way to confirm whether Mr. Trenkler has an underlying cardiomyopathy as opposed to a pacing induced cardiomyopathy is to conduct an echocardiogram to assess whether his ejection fraction has improved" since he received his new pacemaker).  He states that approximately 75% of patients with pacing-induced cardiomyopathy see an improvement or complete

23

reversal of cardiomyopathy after receiving a biventricular
pacemaker, and faults Trenkler's experts for reaching conclusions
based on Trenkler's condition prior to the implantation of the new
pacemaker. Goldberg Supp. Decl. ¶ 6. He maintains that Trenkler's
cardiomyopathy is likely pacing induced. Id. ¶ 8. Dr. Goldberg
is satisfied that, as of the date of his January declaration,
Trenkler's condition is "being managed well." Goldberg Decl. ¶
11; see also Goldberg Supp. Decl. ¶ 11 ("[I]t appears that the
[BOP] medical personnel have responded promptly and appropriately
when Mr. Trenkler has heart-related medical complaints . . . ."").
He concluded that "there is an approximately 75% chance his
ejection fraction will improve within the next six months, to the
extent it has not already improved." Goldberg Decl. ¶ 19. Dr.
Goldberg does not believe Trenkler's risk of sudden cardiac death
is as high as Dr. Alabi asserts. Goldberg Supp. Decl. ¶ 10. Dr.
Goldberg's concluding paragraph states:

> Finally, I agree that the virus that causes COVID-19 can
> affect the heart, and patients with certain heart
> conditions are at an increased risk for severe illness.
> However, Mr. Trenkler does not have clinically
> significant heart failure or coronary artery disease.
> Further, his biggest risk factor is his cardiomyopathy,
> which as discussed, is reversible and likely improving.

Goldberg Decl. ¶ 20.

The Centers for Disease Control and Prevention ("CDC") warns
that people with heart failure, coronary artery disease,
cardiomyopathies, hypertension and/or a history of smoking have an

increased risk of severe illness from COVID-19.[13]   However one reads the parties' proffered expert declarations, it is inescapable that Trenkler falls within the CDC's classification of people at risk for severe COVID-19 illness.   The record reflects that Trenkler has cardiomyopathy of uncertain origin, and while it may be improving, it may not be.   See Esperance Supp. Decl. (noting that "if the cause of [Trenkler's] heart failure is pacer-driven cardiomyopathy, it is possible that his heart function may improve with appropriate medical management [but] this is not true for all patients.").   He has coronary artery disease, even if "very minor." See Goldberg Decl. ¶ 9, 10.   Moreover, it is undeniable that Trenkler has a history of serious heart conditions.   See Gov't Opp'n 5, 19 ("The government does not dispute that Trenkler has been diagnosed with heart block, cardiomyopathy, and non-obstructive coronary artery disease.").

Trenkler argues that the wide-spread COVID-19 outbreak among the USP Tucson inmate population this past winter demonstrates that his risk for severe disease or death is imminent.   Indeed, the BOP reports that, as of the date of this decision, 878 inmates and 118 staff have recovered from a COVID-19 infection at USP

---

[13] See CDC, Certain Medical Conditions and Risk for Severe COVID-19 Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#heart-conditions (last visited May 5, 2021).

Tucson.[14]    See   Federal   Bureau   of   Prisons,   COVID-19   Cases,
www.bop.gov/coronavirus (last visited May 5, 2021).  Moreover, 11
inmates have died from COVID-19 while incarcerated at USP Tucson.
Id.  When ranked by number of recovered inmates, there can be no
question that USP Tucson ranks as having had one of the hardest
hit BOP inmate populations in the country.   Id.  Regardless of the
extensive mitigation and containment efforts the BOP contends it
has in place, see generally Decl. of Shannon Bass, Ex. 2 to Gov't
Opp'n, ECF No. 758-2, those efforts either were ineffective at the
height of the pandemic or ineptly executed.   No other reasonable
conclusion can be reached from the raw infection data.

    But  the  COVID-19  pandemic  landscape  is  improving – both
nationally and at USP Tucson.  As of this writing, the BOP reports
there  are  no  current  COVID-19  infections  among  the  inmate
population and staff at the facility.  Federal Bureau of Prisons,
COVID-19 Cases, supra.  The government represents that, as of March
30, 2021, at least 200 of the 1,349 inmates incarcerated at USP

---

[14] USP Tucson has an inmate population of 1,257 as of this
writing.    See   Federal   Bureau   of   Prisons,   USP   Tucson,
https://www.bop.gov/locations/institutions/tcp/ (last visited May
5, 2021).  The government asserts that USP Tucson's infection rate
is less than 70% (878 cases divided by 1,257 inmates) because some
inmates have been released from the penitentiary and other inmates
have moved in.  See Gov't Sur-Reply 3 n.4, ECF No. 773.  The number
of infected inmates, however, has gone down over time, perhaps
suggesting that the BOP removes from their accounting inmates who
have left the facility.   Regardless, the infection rate, on this
record, remains concerning.

Tucson's maximum security facility and adjacent minimum security camp have received two shots of the Pfizer or Moderna vaccines, and an additional 700 inmates have received their first shot. Gov't Status Report 1, ECF No. 785.  At least 70% of the USP Tucson staff also have been vaccinated against COVID-19.  Id. at 2.  A total of 864 inmates, as of the end of March, had recovered from COVID-19.  Id. at 1.  The BOP offered Trenkler a vaccine on March 18, 2021, and he declined it.  Id. at 2.  He was again offered, and accepted, the first dose of the Moderna vaccine on April 20, 2021.  Not. of Vaccination, ECF No. 800.

The Court concludes that the combination of Trenkler's age, smoking history, overweight-to-obese BMI, hypertension, and heart condition place him at heightened risk of severe illness or death were he to contract COVID-19 before vaccination.  See United States v. Ramirez, 459 F. Supp. 3d 333, 340 (D. Mass. 2020) (concluding "that compassionate release may be available for those at a particularly high risk from the coronavirus, provided their release is otherwise appropriate under the section 3553 factors" (citing 18 U.S.C. § 3582(c)(1)(A)); see also Gov't Opp'n 7.  That said, because Trenkler has received his first shot of the Moderna vaccine, and because of the state of the virus at USP Tucson has significantly improved, the Court concludes that Trenkler's heightened risk for severe COVID-19 does not rise to the level of extraordinary and compelling circumstances.  See United States v.

<u>Baeza-Vargas</u>, No. CR1000448010PHXJAT, 2021 WL 1250349, at *3 (D. Ariz. Apr. 5, 2021) (denying compassionate release for an inmate with preexisting health conditions where COVID-19 vaccine was offered and collecting cases). These factors may, however, be appropriate to consider when assessing whether a reduction in the sentence should be granted as part of the § 3553(a) analysis.

### 2.   Circumstances Surrounding Conviction and Sentence

In addition to the risks associated with the COVID-19 pandemic, Trenkler urges the Court to reduce his sentence to time served in light of the "unique circumstances" surrounding his case. Those unique circumstances, in Trenkler's view, include questions surrounding his guilt and the fundamental unfairness of his conviction; the disproportionality of his sentence as compared to Shay, Jr.'s sentence; and his unlawfully imposed life sentence. <u>See</u> Def.'s Mot. 17-25.

On the first charge, Trenkler argues that some of the circumstantial evidence presented against him at trial has tarnished with age. As discussed above, the First Circuit held, on direct appeal, that the district court erred in admitting the EXIS database evidence but nonetheless concluded that its introduction amounted to harmless error. <u>Trenkler I</u>, 61 F.3d 45. In a compelling dissent, Judge Torruella made a strong argument that introduction of the EXIS database was not harmless error. <u>Id.</u> at 69 (Torruella, J., dissenting). Judge Torruella also called

28

into doubt the trustworthiness of cellmate Lindholm's testimony against Trenkler. Id. Though Lindholm told the jury he had received no benefit from his testimony against Trenkler, the government moved to reduce Lindholm's sentence shortly after Trenkler's conviction and sentencing, citing Lindholm's cooperation. See Ex. 11 to Def.'s Mot., Government's Motion for Reduction of Sentence, ECF No. 121 in United States v. Lindholm, No. 90-10080-WD (D. Mass. July 19, 1994).

Moreover, the evidence and verdict at Shay, Jr.'s trial reflect a jury finding that Shay, Jr. intended only to damage his father's car; the government made no mention of insurance proceeds at Shay, Jr.'s trial. See Ex. 1 to Def.'s Mot., at 10-12. Lastly, in and around 2007, five jurors wrote letters to Judge Zobel stating that they had doubts about Trenkler's guilt, as well as concerns about the homophobic atmosphere that pervaded the government's case and other aspects of the evidence and trial. Some of the jurors asked Judge Zobel to correct these perceived wrongs. See Def.'s Submission of Juror Letters, ECF No. 777.

These are serious but not overwhelming arguments. No doubt, they raise concerns about Trenkler's guilty verdict and draw into question the fundamental fairness of his trial. But unlike a situation where newly discovered DNA evidence makes clear beyond doubt that a person has been wrongfully convicted, here, the evidence and arguments raise questions and perhaps even doubts –

29

but no more.  So while this Court may be able to say that a jury
today likely would not convict Trenkler because reasonable doubt
may exist, that is far short of concluding he is innocent.  These
issues are not sufficient to establish extraordinary and
compelling circumstances.

Trenkler's next argument goes to the disproportionality of
the co-defendants' sentences.  To be sure, Trenkler and Shay, Jr.
were given different terms of incarceration.  But while the
difference in their sentences is striking, this does not rise to
the level of extraordinary or compelling circumstances.  The co-
defendants' respective juries made different findings as to each
defendant.  Indeed, a jury initially acquitted Shay, Jr. of one
count, and Shay, Jr. pleaded guilty to the remaining two counts
after his conviction was reversed.  In Shay, Jr.'s case, the
district court determined the appropriate starting offense level
was 33, and that the felony murder cross reference under U.S.S.G.
§ 2A1.1 cmt. n.2(B) did not apply.  See Shay Jr. Sentencing Hr'g
(Oct. 8, 1993) Tr. 101:9-19, 122:2-22, ECF No. 758-6.  Trenkler's
jury, in contrast, convicted him on all three counts, and the judge
found that § 2A1.1 cmt. n.2(B) did apply, making the starting
offense level 43.  The distinction between the two cases' Guideline
calculations is a technical one, to say the least.  Because the
two defendants scored differently under the federal sentencing
Guidelines, however, it is to be expected that they would receive

different sentences.  But while some degree of disparity is to be
expected, the 18 U.S.C. § 3553 factors and the Sentencing
Guidelines counsel that unwarranted disparities are to be avoided.
Therefore, while this difference (between 144 months and life)
does not amount to extraordinary and compelling circumstances, it
can and should be considered when determining the appropriate level
of sentence reduction, in the event a reduction is appropriate
under § 3582(c)(1)(A).  See United States v. Reyes-Santiago, 804
F.3d 453, 467 (1st Cir. 2015) (noting that the First Circuit has
"routinely rejected disparity claims . . . because complaining
defendants typically fail to acknowledge material differences
between their own circumstances and those of their more leniently
punished confederates").

That leaves the error that occurred in Trenkler's original
sentencing.  The government argues that this Court cannot properly
consider the sentencing error under § 3582(c)(1)(A)(i).  First,
the government argues that the Sentencing Commission's policy
statement on compassionate release, U.S.S.G. § 1B1.13, applies to
inmate-filed motions.  Gov't Resp. to Court's Order 1-4, ECF No.
793.  As addressed above, the Court disagrees on that score, and
follows the ever-mounting authority holding that a district
court's discretion on an inmate-filed motion for compassionate
release is not constrained by § 1B1.13.  See supra Part II.A.
Second, the government argues that this Court is constrained by

31

the First Circuit's decision in <u>Trenkler VI</u>, which vacated Judge Zobel's grant of coram nobis relief and reinstated Trenkler's original sentence.  Gov't Resp. to Court's Order 4-8.  Precedent suggests otherwise.

In <u>Trenkler VI</u>, 536 F.3d 85, the Court of Appeals found that the district court was without jurisdiction to grant coram nobis relief because the motion was in effect a second or successive petition under § 2255 filed without leave from the court and barred by AEDPA.  <u>Id.</u> at 97-100.  While the Court of Appeals acknowledged that the imposition of a life sentence by the trial judge, rather than the jury, was an "apparent error", it characterized the error as procedural in nature and not substantive, and therefore not a "miscarriage of justice" as that term has been interpreted by the Supreme Court.  <u>Id.</u> at 99.  The court recognized that this left Trenkler unable to challenge an apparently unlawfully imposed life term, but such a result was necessary in order to give effect to AEDPA.  What the court wrote on that occasion bears repeating here, inasmuch as it makes so clear that courts are required to give fealty to Congress's will:

> We appreciate the able district judge's desire to correct an apparent error attributable to the lawyers' shared misperception.  We admire as well the ingenuity displayed by appointed counsel in attempting to rectify that mistake.  But the rule of law must remain paramount and, as Lord Campbell warned long ago, hard cases have a propensity to make bad law.  That propensity must be held in check.  That is our obligation here.

Implicit in the scheme created by AEDPA is the notion that certain claims, which might have been fruitful if timely asserted, may be foreclosed when a convicted defendant sleeps upon his rights. That our criminal justice system tolerates a certain risk of error might be of concern to some, but finality is indispensable to the proper functioning of that system. Under AEDPA, there is typically "only one bite at the post-conviction apple." The petitioner has had that bite.

Trenkler VI, 536 F.3d at 99 (internal citations omitted).

The government argues that this holding puts the final nail in the coffin as far as Trenkler's attempts to get post-conviction relief are concerned. See Gov't Opp'n 9. This argument misses the mark. The First Circuit's holding was premised upon a strict application of AEDPA (once the court found the underlying petition for a writ of coram nobis was effectively a motion under § 2255). Trenkler VI, 536 F.3d at 97-100. But now Congress has spoken again. And this time it has given trial judges broad authority – indeed it has imposed a statutory duty, upon a defendant's motion – to conduct an individualized review of the defendant's case for extraordinary and compelling circumstances that call out for correction. See Maumau, 2021 WL 1217855, at *12 (holding that the district court had discretion to grant compassionate release after an individualized review of all the circumstances of the case, including the "incredible length of" the defendant's § 924(c) stacked sentences); Brooker, 976 F.3d at 237–38 (holding that a court should consider "all possible reasons for compassionate

33

release", including the "injustice of [a defendant's] lengthy sentence"). Moreover, at the time of this writing, there is a growing consensus among courts that there are few if any limitations on what may be considered an extraordinary and compelling reason warranting release, even those claims that have been rejected on direct appeal or collateral attack.  See, e.g., United States v. McGee, No. 20-5047, 2021 WL 1168980, at *1-2 (10th Cir. Mar. 29, 2021) (holding that a district court would have authority to grant relief where the defendant sought relief from a mandatory life sentence that had been upheld on direct appeal and withstood collateral attacks); United States v. Cano, No. 95-00481-CR, 2020 WL 7415833, at *5-*6 (S.D. Fla. Dec. 16, 2020) (granting compassionate relief where the defendant claimed in part that the court erred in sentencing him to life imprisonment and that claim had been rejected on direct appeal and in collateral attacks).

The cases granting relief from sentences stacked under 18 U.S.C. § 924(c) are instructive.  As background, prior to 2018, § 924(c)(1)(C) required district courts to impose a higher, and escalating, penalty for a "second or subsequent count of conviction" under § 924(c)(1)(C), including in a single case with multiple counts.  This resulted in lengthy, so-called "stacked", sentences.  McCoy, 981 F.3d at 285.  In 2018, the First Step Act amended § 924(c)(1)(C) to trigger the higher penalty for a "second

or subsequent count of conviction" under § 924(c) only when a defendant has a final conviction under § 924(c) in a prior case. Id. (citing § 403(a), 132 Stat. at 5222).  Congress did not, however, make this amendment retroactive.  Id. Nonetheless circuit and district courts have overwhelmingly held that, after conducting an individualized review, a district court has broad discretion under § 3582(c)(1)(A) to reduce § 924(c) stacked sentences in light of Congress's decision to eliminate stacked sentences prospectively.  See, e.g., McCoy, 981 F.3d at 285 (collecting cases); Jones, 482 F. Supp. 3d at 980-81 (collecting cases).  As the Fourth Circuit explained, "the very purpose of § 3582(c)(1)(A) is to provide a 'safety valve' that allows for sentence reductions when there is not a specific statute that already affords relief but 'extraordinary and compelling reasons' nevertheless justify a reduction." McCoy, 981 F.3d at 287 (citing Jones, 482 F. Supp. 3d at 980-81).

These cases – and others like them – leave no question that this Court may conclude that a legal error at sentencing constitutes an extraordinary and compelling reason, and reduce the sentence after conducting an individualized review of the case.[15]

_____

[15] The government's cited cases to the contrary are not convincing.  To the extent these cases do not fully delve into the background and context of the First Step Act's amendment to § 3582(c)(1)(A), as addressed above, this Court does not find them persuasive.  See, e.g., United States v. Handerhan, 789 F. App'x 924, 926 (3d Cir. 2019) (summarily dismissing in an unpublished

Here, the Court is deploying the broad discretion provided in one statute – § 3582(c)(1)(A) – to effectuate Congress's clearly stated intent in a separate statute, <u>see</u> 18 U.S.C. § 34, as incorporated by 18 U.S.C. § 844 (1993).  In this respect, this case stands on even firmer ground than the § 924(c) stacking cases because there is no space between this Court's exercise of discretion and Congress's intent at the time of Trenkler's sentencing.  Other courts have similarly used their broad discretion under § 3582(c)(1)(A) to correct sentencing errors.  <u>See, e.g.</u>, <u>United States v. Lopez</u>, No. 11-CR-568 (PKC), 2021 WL 761850, at *4 (S.D.N.Y. Feb. 26, 2021) (holding that "the significant error in [the defendant's] Guidelines calculation[] and the absence of any other avenue to correct th[e] error constitute[s] an

_____

decision a pro se defendant's arguments for compassionate release based on a sentencing error, querying "'whether an alleged sentencing error that was correctible in prior proceedings could ever be an 'extraordinary and compelling reason'").  Moreover, to the extent the cases address legal errors that may still be remedied through traditional appellate avenues, they are readily distinguishable from the instant case wherein appellate and post-conviction processes cannot provide relief.  <u>See, e.g.</u>, <u>United States v. Lisi</u>, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020), <u>reconsideration denied</u>, No. 15 CR. 457 (KPF), 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020) ("[T]he Court believes that it would be both improper and inconsistent with the First Step Act to allow Lisi to use 18 U.S.C. § 3582(c)(1)(A) as a vehicle for claiming legal wrongs, instead of following the normal methods of a direct appeal or a habeas petition."); <u>United States v. Rivernider</u>, 3:10-CR-222(RNC), 2020 WL 597393, at *5 (D. Conn. Feb. 7, 2020) (noting that the defendant, in his motion for compassionate release, reasserted arguments that had failed on direct appeal or were part of his pending habeas case).

36

'extraordinary and compelling reason' for sentence reduction");
United States v. Wahid, No. 1:14-CR-00214, 2020 WL 4734409, at *3
(N.D. Ohio Aug. 14, 2020) (granting compassionate relief where the
defendant was classified as a career offender and subsequent case
law clarified that classification was in error).

Here, it is both extraordinary and compelling that (1) a judge
sentenced a defendant to life imprisonment using a preponderance
of the evidence standard where the controlling statute provided
that a life sentence could be imposed only by the jury; and (2)
there exists no available avenue for relief from this legal error.

Having concluded that the facts of this case constitute
extraordinary and compelling circumstances warranting a sentence
reduction, the extent of the sentence reduction is left to the
discretion of the Court, with consideration of the sentencing
factors set forth in 18 U.S.C. § 3553.   See 18 U.S.C. §
3582(c)(1)(A).

**D.   Determination of the Sentence Reduction**

**1.   The Two Prior Sentences Imposed by the District Court**

To recap, Judge Zobel originally imposed a life sentence in
1994 without submitting the question of sentencing to the jury as
required by the statute at the time.   Importantly, as to Count 2,
she found Defendant acted with an intent to kill.   Based on this
finding, the federal sentencing Guidelines directed the district

court to § 2A1.1, First Degree Murder, for which the offense level
was and still is designated as 43, and the Guideline range is Life.
See U.S.S.G. § 2A1.1.  At the time of the sentencing in 1994, and
notwithstanding the statute, such findings were made by trial
judges in the ordinary course.  In addition, in 1994 the federal
sentencing Guidelines were mandatory, not advisory, so Judge Zobel
would not have had the discretion to vary from the life sentence.

By the time the sentencing error was discovered and Trenkler
was before Judge Zobel for resentencing in 2007, federal sentencing
law had changed dramatically.  In 2000, the Supreme Court decided
Apprendi v. New Jersey, 530 U.S. 466 (2000), which held that it
was a violation of a defendant's Sixth Amendment right to a jury
trial for a judge to make factual findings that had the effect of
increasing a sentence beyond the statutory maximum for the crime
of conviction.  Then, in Ring v. Arizona, 536 U.S. 584 (2002), the
Court found unconstitutional Arizona's death penalty statute,
which allowed judges to make the factual findings necessary for
the imposition of the death penalty.  Two years later, in Blakely
v. Washington, 542 U.S. 296 (2004), the Court held that Washington
state's sentencing guidelines effectively constituted the
statutory maximum for purposes of applying the Sixth Amendment
right to have a jury find any fact that increases a sentence.  All
of this was, of course, a prelude to the Supreme Court's landmark
holding in United States v. Booker, 543 U.S. 220 (2005).  There,

following the lead of Blakely, the Court held, 5-4, that the federal sentencing Guidelines, because they were mandatory, were unconstitutional to the extent that they allowed judges to make factual findings that increased the Guideline range. Id. at 220-44 ("Constitutional Booker").  To solve this problem, the Court, in a separate 5-4 opinion with a different line-up of Justices, held that the Guidelines were no longer mandatory, but rather advisory. Id. at 244-68 ("Remedial Booker").[16]

Booker was a major shift in federal sentencing law.  Judges who had previously sentenced defendants mechanically based on rigid Guidelines now had discretion to impose sentences within or outside the Guidelines, as they felt just.  But the extent and limitations on that discretion was not obvious in the immediate aftermath of Booker.  In a flurry of opinions by both district courts and courts of appeals, judges attempted to put some guideposts in place to govern Booker's grant of discretion.  It took several years, and at least three more important decisions, see Kimbrough v. United States, 552 U.S. 85 (2007); Gall v. United States, 552 U.S. 38 (2007); Spears v. United States, 555 U.S. 261 (2009), for the dust to fully settle, and for the Supreme Court to

---

[16] Justice Stevens, in his dissent, suggested that a more appropriate remedy to the constitutional problem with the Guidelines would be to have juries decide factual issues that could increase the Guideline range. Booker, 543 U.S. at 284-85 (Stevens, J., dissenting).  In the months after Booker was decided, some judges (this one included) experimented with this approach.

vest district courts with complete discretion to vary from the Guideline range, so long as variances are explained with reference to the governing standards of 18 U.S.C. § 3553.

This history is important context here. Between the original sentencing in 1994 and the resentencing in 2007, the entire landscape of sentencing shifted. Judge Zobel in 1994 was operating in a legal framework (putting aside the statutory requirement that the jury impose any life sentence) where (1) it was common and appropriate for judges to make factual findings that would have the effect of increasing the maximum penalty; and (2) the applicable Guideline range was binding on the court. Thus, once she found that Trenkler had the intent to kill, and his offense level was 43, she had no choice but to impose the life term. When she resentenced Trenkler in 2007, she declined to make any factual findings and relied on only the jury's verdict. She determined that in the absence of a jury finding the verdict on Count 2 could only be read as a finding that Trenkler acted with the intent to destroy property with death resulting, the least culpable conduct criminalized under the statute. But because the crime was committed in connection with another felony, the Guideline for felony murder applied, § 2A1.1 cmt. n.2(B).[17]  As a result, his

---

[17] Section 2A1.1 cmt. n.2(B) of the 2007 U.S. Sentencing Guidelines, as well as the 2018 Sentencing Guidelines, currently in effect, provides that the Guideline range starts at 43, but may be adjusted downward:

Guideline offense level remained 43 (with a now advisory range of
Life), with the commentary that the sentencing judge could depart
(or vary) downward based on the circumstances.   Judge Zobel's
statement with respect to her assessment in relevant part was as
follows:

> [T]he jury found the defendant guilty on two
> counts, each of which described the conduct and stated
> that, "The above-described unlawful conduct directly and
> proximately caused the death of Jeremiah Hurley and
> serious personal injury to Francis Foley, both public
> safety officers who were performing their official
> duties."
>
> This provision was specifically brought to the
> jury's attention during the charge, and I think that
> that being the case and the jury having returned guilty
> verdicts on each of Counts 2 and 3, the statutory maximum
> on those counts is not ten years, but in the context of
> this case life, because the statute, as counsel have
> pointed out, has a ten-year maximum for using the least

---

Felony Murder.—If the defendant did not cause the death
intentionally or knowingly, a downward departure may be
warranted. For example, a downward departure may be
warranted if in robbing a bank, the defendant merely
passed a note to the teller, as a result of which the
teller had a heart attack and died. The extent of the
departure should be based upon the defendant's state of
mind (e.g., recklessness or negligence), the degree of
risk inherent in the conduct, and the nature of the
underlying offense conduct.   However, departure below
the minimum guideline sentence provided for second
degree murder in §2A1.2 (Second Degree Murder) is not
likely to be appropriate.  Also, because death obviously
is an aggravating factor, it necessarily would be
inappropriate to impose a sentence at a level below that
which the guideline for the underlying offense requires
in the absence of death.

U.S.S.G. § 2A1.1 cmt. n.2(B) (2007); see also U.S.S.G. § 2A1.1
cmt. n.2(B) (2018).

of the elements of the offense for damaging – for using explosives to damage personal property.  However, if personal injury results, the maximum becomes 20 years, and if death results, the maximum becomes life.  I believe that the jury having determined that death resulted, the maximum is not ten years, but life.

Now, that takes me to the Guidelines.

To find the defendant guilty on Count 2 – and I focus on Count 2 because it is different by the addition of the intent to kill.  The jury had to determine that the defendant used explosive material either to kill, injure or intimidate Mr. Shay, Sr., or to cause property damages.

* * *

Since even damaging property by means of explosives is a felony, the finding that death resulted makes the offense felony murder, and felony murder carries a Guideline and Total Offense Level of 43.  So, that is the offense level that I come to without making the fact findings that I believe now were, in fact, wrong.

The parties disagree as to whether I may appropriately impose a life sentence at this time, and I will not because – partly out of an abundance of caution and given the discretion that Booker allows.

I do sentence you to a term of imprisonment of 37 years, which is the life expectancy at the time of the original sentence.  That is the sentence on Counts 2 and 3.  I sentence you to a term of five years on Count 1.  All of these are to be served concurrently.  I do not believe that stacking is appropriate or legal.  Therefore, the sentences are to be served concurrently.

Resentencing Tr. 60-62, ECF No. 758-5.

All of this matters now as context for several reasons. First, while the First Circuit held in Trenkler VI that Judge Zobel lacked jurisdiction to impose the revised sentence, it has never been suggested that her assessment of an appropriate sentence, in

42

the post-Apprendi, post-Booker, environment was substantively wrong or unreasonable; her recitation of law and the Guideline application was correct then, as it is now.  Second, and relatedly, Judge Zobel had the discretion to impose any term of years she deemed appropriate under Booker, and she exercised her discretion in reaching the decision to impose a 37-year sentence, Trenkler's life expectancy at the time of his original sentencing[18]; and third, she concluded – as the undersigned judge has now also independently concluded – that one can only be certain from the jury's verdict

---

[18] The weight of authority interpreting 18 U.S.C. § 34, as incorporated by 18 U.S.C. § 844 (1993), made clear that a court may not impose a life sentence absent the jury's directive.  See, e.g., United States v. Hansen, 755 F.2d 629, 631 (8th Cir. 1985)(holding that the court not impose a life sentence where the record did not reflect that the jury recommended it); United States v. Williams, 775 F.2d 1295, 1299 (5th Cir. 1985)(holding that, in the absence of a "jury recommendation or jury waiver," the court could not sentence the defendant to life imprisonment); United States v. Prevatte, 66 F.3d 840, 845-46 (7th Cir. 1995); United States v. Gullett, 75 F.3d 941, 949-50 (4th Cir. 1996); United States v. Tocco, 135 F.3d 116, 131 (2d Cir. 1998).  As a result, many courts further took the view that a sentence just shy of the defendant's life expectancy was the appropriate ceiling for a judge-imposed sentence under the statute.  See, e.g., Tocco, 135 F.3d at 131-32 (affirming a sentence calculated to be, inclusive of good time, approximately one month less than the defendant's life expectancy); United States v. Martin, 115 F.3d 454, 455 (7th Cir. 1997)(affirming a 25 year sentence imposed on a defendant with a 25.9-year life expectancy); Gullett, 75 F.3d at 950-51 (upholding sentence calculated to be, inclusive of good time, less than a year below the defendant's life expectancy); Prevatte, 66 F.3d at 845-46 (vacating sentence and remanding to the district court to impose a sentence not greater than the defendant's life expectancy).  This appears to be the conservative approach taken by Judge Zobel in 2007.

that the jury found Trenkler had the intent to cause property damage with death resulting.  All of this, while clearly not binding, informs the Court regarding the thinking of the trial judge who viewed the evidence, heard the arguments, and had the opportunity to reflect over 14 years about the case.  For this Court, in conducting an independent assessment under the First Step Act, this is valuable context.  To reach a conclusion on what sentence should be imposed, the Court turns to an evaluation of the factors under § 3553.

### 2.    Sentencing Factors under 18 U.S.C. § 3553

As there are no applicable Sentencing Commission policy statements governing defendant-filed motions for compassionate release, the Court turns to the sentencing factors under 18 U.S.C. § 3553.  To begin, as discussed above, the offense level under the Guidelines is 43, and at Criminal History Category I, the advisory Guideline range is Life.  However, the Court is prohibited from imposing a life term or a term of years in excess of life expectancy for the reasons discussed.  Pursuant to U.S.S.G. § 2A1.1 cmt. n.2(B), the Court may depart or vary down from level 43 depending on the defendant's conduct.[19]

With respect to the first factor, the nature and circumstances of the offense and the history and characteristics of the

---

[19] Section 994(t) provides that "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason."

defendant, Trenkler stands before the Court convicted of extremely serious crimes.  Trenkler was convicted of building a bomb that resulted in the horrific death of one on-duty officer and the maiming of a second officer.  It was a heinous crime that required forethought and planning.  But like Judge Zobel, the Court cannot conclude that the jury found he intended to kill Shay, Sr.  It is obvious, however, that a bomb of this nature had a very high potential to kill and/or injure.  It would take great skill, or luck, to detonate a bomb attached to a car in a residential area without doing so.  Thus, to the extent that § 2A1.1 cmt. n.2(B) suggests that the Court should take into consideration the circumstances of the crime and how it led to death in determining whether a departure (or, a variance pursuant to Booker) is appropriate, Defendant deserves little in the way of mitigating credit.

Trenkler's characteristics (then as now) suggest a sentence short of life expectancy could be appropriate.  Prior to the commission of this offense, Trenkler had no significant criminal history, though he had stipulated to having made the Quincy device. He was a young adult, age 35, at the time of the offenses.  He is obviously much older now, and he has a number of well-documented (if somewhat disputed) health conditions discussed above.

---

28 U.S.C. § 994(t).  Counsel make no argument as to rehabilitation, and the Court does not consider it.

Moreover, defense counsel represents – and the government does not dispute – that Trenkler has had no significant disciplinary infractions while incarcerated.  Def.'s Mot. 26.

The sentence to be imposed must reflect the seriousness of the offenses, promote respect for the law, and provide just punishment.  Trenkler argues that, in 2020, the median sentence imposed under federal law for murder (excluding manslaughter, but including second degree murder and conspiracy or solicitation to commit murder) was nineteen years.[20]  But this figure is misleading in the breadth of offenses it covers.  This Court requested more precise data from the U.S. Sentencing Commission for cases involving convictions under §§ 844(d) or 844(i) where death resulted.  Of the roughly 15 cases found from 2007 forward, 5 received life; 1 received 600 months (effectively life); 6 received 360 months or greater (but less than life); and 3 less than 360 months.[21]  As just discussed, the nature of the crime here was truly horrible, in design and effect.  It reflects a deep disregard for human life, and for the potential collateral damage likely to be inflicted.  The bomb easily could have killed more people,

---

[20] See U.S. Sentencing Commission, 2020 Sourcebook, Sentence Imposed by Type of Crime, Fiscal Year 2020 (Table 15 & App. A), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

[21] Email on file with the Court.

including children.  This depravity cannot be ignored.  So, even
without a jury finding of intent to kill, the Court is left with
an abiding conviction that Trenkler, at best, did not care who he
killed.  And a sentence similar to the sentences meted out in the
above-referenced cases is called for.

Trenkler asks this Court to consider the questions and issues
surrounding his trial and conviction.  As discussed earlier, none
of these issues rise to the level of demonstrating actual
innocence, and he does not so argue.  Rather, he seems to suggest
that the sentence should be discounted to reflect these
uncertainties.  This is an understandable plea, but it is not how
the law works.  This Court is duty bound to respect and give full
effect to the verdict of the jury, and thus the Court gives little
weight to Defendant's argument regarding these doubts and
concerns.  But while the Court cannot second guess the jury's
verdict, it can, in determining the appropriate sentence,
administer justice with a measure of mercy, even for one who is
convicted of a heinous crime.

As Judge Zobel noted, Trenkler's life expectancy in 1994 was
75 years.  This Court believes it is more appropriate to consider
present life expectancy when determining an appropriate reduction.
Today, Trenkler's statistical life expectancy is approximately 83
years – or 18 more years.  See Social Security Administration,
Period Life Expectancy (Table 1), available at

47

https://www.ssa.gov/OACT/NOTES/ran2/an2020-2.pdf.      Translated
into a term of years, this would be a sentence of 46 years.   In
the Court's view, a sentence of 41 years would be one that reflects
the seriousness of the offenses, promotes respect for the law, and
provides just punishment for the offenses, while taking into
account the history and characteristics of Defendant.   Moreover,
such a lengthy sentence under these conditions would also provide
adequate deterrence (both specific and general) to criminal
conduct.   By the time Trenkler is released, he will have served
over three decades (assuming good time) in U.S. Penitentiaries,
including through a pandemic.[22]

     The Court is also satisfied that this sentence serves to
protect the public from further crimes of the defendant.   Defendant
is, statistically speaking, very unlikely to reoffend.   See U.S.
Sentencing Commission, The Effects of Aging on Recidivism Among
Federal        Offenders        3,        available        at
https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2017/20171207_Recidivism-
Age.pdf (finding that "[o]lder offenders were substantially less
likely than younger offenders to recidivate following release[,]"
and more specifically, that "13.4 percent of offenders age 65 or

---

[22] Trenkler has served about 28 years thus far.   If he were
to serve the additional 13 years, he would be approximately 78
years old at the time of release.   With good time credit, he will
likely be in his early 70s upon release.

older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release"). A defendant over the age of 60 who has served more than 120 months has a 5.1 percent chance of recidivism.  Id. at 18.  Moreover, because Trenkler holds a college degree and was classified in Criminal History Category I, he is statistically even less likely to reoffend upon release.  Id. at 3.

Furthermore, the Court concludes that, given Trenkler's medical needs, reducing his sentence to a term of 41 years will allow him to seek needed medical care outside of a prison setting during the final years of his life.  Trenkler also appears to have a stable and supportive residence to which he can be released. According to counsel, David Wallace, Trenkler's half-brother, has offered to have Trenkler live with him in Maine.  Def.'s Mot. 26. Trenkler also has been supported by people dedicated to his innocence throughout his incarceration, and this added support perhaps will be of assistance upon his release.

This sentence falls within the applicable sentencing range established for this category of offense and defendant, as set forth in the Guidelines.  The Court finds that this sentence will also further the goal of avoiding unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, as 41 years is well within the range of appropriate sentences for the offense conduct at issue as discussed above.  And, such a sentencing reduction will reduce the disparity between Trenkler's sentence and Shay, Jr.'s sentence.

Accordingly, considering all of the § 3553 factors and all of the issues discussed herein, the Court reduces the sentence to a term of 41 years, with 5 years of supervised release.  The Court finds this sentence is sufficient but not greater than necessary for the offenses of conviction.  <u>See generally</u> 18 U.S.C. § 3553(a).[23]

---

[23] Nothing in this Opinion and Order should be read in any way to reflect a lack of empathy for the surviving victim and victims' families who have been so tragically impacted by this crime.  I have read the letters submitted by the victims' family members, colleagues, and friends, and listened carefully to the moving victim impact statements at the hearing on this motion.  I feel their pain as much as anyone in my position can.  Sentencing is the most difficult task that judges perform.  My duty is to look at the entire picture including the law as discussed herein, and including the impact on victims, and to the best of my ability, do justice.  I hope the surviving victim and the victims' families can understand the reasons for the Court's decision, even as they will no doubt disagree with them.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Compassionate Release is GRANTED IN PART AND DENIED IN PART. The Court reduces Defendant's sentence to a term of 41 years' imprisonment, followed by a term of supervised release of 3 years on Count 1s, 5 years on Count 2s, and 5 years on Count 3s, all to run concurrently.[24]

IT IS SO ORDERED.

_____
William E. Smith[25]
District Judge
Date:  May 6, 2021

---

[24] The Court orders conditions of supervised release as set forth in the Addendum to this Opinion and Order.

[25] The Honorable William E. Smith, United States District Judge for the District of Rhode Island, sitting by designation.

**ADDENDUM:  CONDITIONS OF POST-CONVICTION SUPERVISION**
United States v. Alfred Trenkler
1:92CR10369

1. You must not commit another federal state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter by the court.
4. You must cooperate in the collection of DNA as directed by the probation officer.
5. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
6. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
7. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission form the court or the probation officer.
8. You must answer truthfully the questions asked by your probation officer.
9. You must live at a place approved by the probation officer.  If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
10. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
11. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so.  If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
12. You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
13. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
14. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

15. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

16. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.

17. You must follow the instructions of the probation officer related to the conditions of supervision.

18. You shall participate in mental health treatment, as directed by the supervising officer, until released from the program by the supervising officer. You shall pay/co-pay for services during such treatment, to the supervising officer's satisfaction.

19. You shall not use or possess any controlled substance, alcohol or other intoxicant; and shall participate in a program of drug and alcohol abuse therapy to the supervising officer's satisfaction. This shall include testing to determine if Defendant has used drugs or intoxicants.  You shall pay/co-pay for services during such treatment to the supervising officer's satisfaction. You shall not obstruct or tamper, or try to obstruct or tamper, in any way, with any tests.

20. A United States probation officer may conduct a search of the defendant and of anything the defendant owns, uses, or possesses if the officer reasonably suspects that the defendant has violated a condition of supervised release and reasonably suspects that evidence of the violation will be found in the areas to be searched. Searches must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation of release.