UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

ALFRED TRENKLER,

Defendant.

CRIMINAL NO. 92-10369-WES

GOVERNMENT'S OPPOSITION ON REMAND TO MOTION FOR COMPASSIONATE
RELEASE

By Opinion and Order dated May 6, 2021 (ECF 805) (the "Order"), this Court granted in part and denied in part Defendant's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF 744) (the "Motion") and in so doing reduced the defendant's sentence from life to 41 years' imprisonment. *United States v. Trenkler,* 537 F.Supp.3d 91, 144 (D. Mass. 2021). On appeal, the First Circuit vacated this Court's judgment and remanded the matter for further proceedings consistent with its opinion. *United States v. Trenkler,* 47 F.4th 42, 51 (1st Cir. 2022). Because the sole ground on which this Court determined that extraordinary and compelling circumstances exist justifying its exercise of discretion to grant the Motion – a legal error at sentencing – cannot, standing alone, constitute the basis for compassionate release, and because this Court rejected the defendant's other proffered bases for granting relief, the Motion should now be denied in its entirety.

- 1 -

ARGUMENT

I.     A SENTENCING ERROR, STANDING ALONE, CANNOT QUALIFY AS AN
       EXTRAORDINARY AND COMPELLING BASIS FOR COMPASSIONATE
       RELEASE

As is relevant here, the First Step Act of 2018, Pub. L. No. 115-391, sec. 603(b),

provided, among other things, that a prisoner who has exhausted certain administrative rights can

move a court to reduce his term of imprisonment, after consideration of the factors set forth at 18

U.S.C. § 3553(a), if the court finds that "extraordinary and compelling reasons warrant such a

reduction" and that such a reduction is consistent with applicable policy statements issued by the

Sentencing Commission.  18 U.S.C. § 3582(c)(1)(A); *Trenkler*, 47 F.4th at 46-47.  The

defendant here satisfied the administrative requirements, and the First Circuit agreed with this

Court that the existing policy guidelines of the Sentencing Commission do not apply to a motion

initiated by a prisoner.  *Trenkler,* 47 F.4th at 47, citing *United States v. Ruvalcaba,* 26 F.4th 14,

21 (1st Cir. 2022).  In considering the sole basis on which this Court found "extraordinary and

compelling reasons" for granting relief – a sentencing error, 537 F.Supp.3d at 105-07 – the First

Circuit observed that this Court had reached its determination without the benefit of *Ruvalcaba,*

which "set the standard for a district court reviewing a prisoner's proposed reasons for

compassionate release, making it clear that district courts have the discretion to review

petitioner-initiated motions by taking [a] holistic, any-complex-of-circumstances approach[.]"

*Trenkler,* 47 F.4th at 49 (citing *Ruvalcaba,* 26 F.4th at 27, 28).  In the course of vacating this

Court's judgment and remanding the case to afford the Court the opportunity to reassess the

Motion in light of *Ruvalcaba*, the First Circuit made clear that a sentencing error, standing alone,

is not a basis for compassionate release relief.

In its initial consideration of the Motion, this Court rejected all but one of the defendant's proposed bases for granting compassionate release. *See* 537 F.Supp.3d at 101-05. The sole ground on which the Court determined that "extraordinary and compelling reasons" existed to grant compassionate release was the error that occurred at the defendant's sentencing. *Id.* at 105-08. The error – which was missed by the defense, the government, Probation, and the district court judge then presiding over the case – was that, while the statutory scheme then in place called for the jury to direct that a life sentence be imposed, the court imposed a life sentence without having received such input from the jury. *See* 537 F.Supp.3d at 95. By the time the defendant himself learned of the issue, the First Circuit had, *inter alia,* affirmed the defendant's conviction, *United States v. Trenkler*, 61 F.3d 45 (1st Cir. 1995) ("*Trenkler I*"); the denial of the defendant's motion for a new trial, *United States v. Trenkler*, No. 97-1239, 1998 WL 10265 (1st Cir. Jan. 6, 1998) ("*Trenkler II*"); and the denial of a habeas motion the defendant had brought under 28 U.S.C. § 2255, *Trenkler v. United States*, 268 F.3d 16 1st Cir. 2001) ("*Trenkler III*"). The defendant filed a petition for a writ of coram nobis and the district court found the sentencing error sufficiently extraordinary to warrant relief, ultimately vacating the life sentence and imposing a term of 37 years. *Trenkler v. United States,* No. 06-12072-RWZ, 2007 WL 551620 (D. Mass. Feb. 20, 2007); ECF 758 ("*Trenkler IV*").

The government appealed and the First Circuit reversed, reinstating the life sentence. *Trenkler v. United States*, 536 F.3d 85 (1st Cir. 2008) ("*Trenkler V*"). In so doing, the First Circuit determined that "regardless of its label, the petition falls within the compass of section 2255" because it "is brought on behalf of a federal prisoner still in custody and challenges his sentence as unauthorized under the statutes of conviction," *id.* at 97; that "the district court should have recharacterized the petition as a section 2255 petition and proceeded accordingly,"

*id.* at 98; that the petition was foreclosed by gatekeeping provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U,S,C, § 2255(h), because it

was "an unauthorized or successive habeas petition," and because "the petition was not premised

on either newly discovered evidence or a new rule of constitutional law," *id.*; and that the case

did not come within the "narrow confines" of section 2255's "savings clause" because the

petition "did not posit that he is actually innocent of the crimes for which he was" convicted, and

because the error claimed in the petition was merely "procedural" and did "not suggest a

miscarriage of justice," *id.* at 98-99.  The First Circuit said that "when a statute – like section

2255 – specifically addresses a particular class of claims or issues, it is that statute, not the All

Writs Act, that takes precedence."  *Id.* at 97.  And the First Circuit stressed that "the strictures of

section 2255 cannot be sidestepped by the simple expedient of resorting to some more exotic

writ."  *Id.*

The government took the position both before this Court and before the First Circuit,

based on *Trenkler V*  and the AEDPA, that a compassionate release motion based on sentencing

error is, despite its label, a section 2255 motion; that the sentencing error at issue here fails under

section 2255 for the same reason it failed in *Trenkler V*; and that permitting a claim of

sentencing error that runs afoul of AEDPA's gatekeeping requirements to prevail as a basis for

compassionate release would render section 2255 a dead letter by permitting prisoners to seek

compassionate release for claims barred by section 2255.  Both this Court and the First Circuit

disagreed.  The First Circuit stated that the "initial question of what may be *considered* in an

'extraordinary and compelling' determination by the district court is separate from the

secondary, individualized question of what can actually *qualify* as extraordinary and

compelling," 47 F.4th at 48; and that habeas and compassionate relief are "distinct vehicles for

relief," with section 2255 dealing with the legality and validity of a conviction and providing a method for automatic vacatur of sentences, while compassionate relief "is addressed to the court's discretion as to whether to exercise leniency based on an individualized review of a defendant's circumstances," *id.* The First Circuit said that at issue here is the second question, that is, whether the defendant "propose[d] reasons for compassionate release that are extraordinary and compelling," and that, consistent with *Ruvalcaba*, "a district court reviewing a prisoner's proposed reasons for compassionate release … ha[s] the discretion to review prisoner-initiated motions by taking the holistic, any-complex-of-circumstances approach[.]" *Id.* at 49, citing *Ruvalcaba,* 26 F.4th at 27, 28.

In the course of its analysis, however, the First Circuit stated:

> We would add that, in addition to the fact that habeas and compassionate release exist under two distinct statutory schemes, **correct application of the "extraordinary and compelling" standard for compassionate release naturally precludes classic post-conviction arguments, without more, from carrying such motions to success.** Compassionate release is a narrow exception to the rule of finality in sentencing. [Citing *United States v. Saccoccia,* 10 F.4th 1, 3 (1st Cir. 2021)]. It is the "extraordinary and compelling" criteria for compassionate release that promises this general rule will not be superseded by the exception. [Citing *Ruvalcaba,* 26 F.4th at 23].

*Trenkler*, 47 F.4th at 48-49 (emphasis added); *see also id.* at 48 n.14 ("Rather, the inherently narrow (and stringent) 'extraordinary and compelling' standard still must be met to grant relief.").

Here, the sentencing error is a "classic post-conviction argument[]," and one that the First Circuit rejected in *Trenkler V.* Accordingly, the sole ground that this Court found to be a basis for granting the Motion is a "reason[] [that], standing alone, [is] insufficient as a matter of law when measured against the 'extraordinary and compelling' standard." *See Trenkler,* 47 F.4th at

50 (noting that in *Ruvalcaba* the First Circuit had identified a change in sentencing law as a reason that, standing alone, could not qualify as an "extraordinary and compelling reason" to grant compassionate release).

II.    THIS COURT HAS ALREADY REJECTED THE OTHER GROUNDS ADVANCED BY THE DEFENDANT FOR COMPASSIONATE RELEASE

In the Order, this Court has already rejected each of the other grounds proffered by the defendant as extraordinary and compelling reasons for granting compassionate release.

The Court first considered the defendant's contention that extraordinary and compelling reasons warranted his immediate release because he suffers from cardiac disease that put him at an increased risk of serious illness and death were he to contract COVID-19.  After a careful review of the parties' expert submissions regarding the defendant's medical condition, along with the fact that the Moderna vaccine had become available to the defendant by the time the Court decided the Motion, the fact that the defendant had received the first dose of the vaccine, and the fact that conditions at the defendant's facility had significantly improved, this Court determined that the defendant's heightened risk vis-à-vis COVID-19 "does not rise to the level of extraordinary and compelling circumstances."  537 F.Supp.3d at 104.

The Court next addressed issues relating to the defendant's trial.  The Court framed the first such issue as follows:

> [T]he First Circuit held, on direct appeal, that the district court erred in admitting the EXIS database evidence but nonetheless concluded that its introduction amounted to harmless error. *Trenkler I*, 61 F.3d 45.  In a compelling dissent, Judge Torruella made a strong argument that introduction of the EXIS database was not harmless error. *Id.* at 69 (Torruella, J., dissenting).  Judge Torruella also called into doubt the trustworthiness of cellmate Lindholm's testimony against Trenkler. *Id.*  Though Lindholm told the jury he had received no benefit from his testimony against Trenkler, the government moved to reduce Lindholm's sentence

> shortly after Trenkler's conviction and sentencing, citing
> Lindholm's cooperation.

Order, 537 F.Supp.3d at 104.  The majority in *Trenkler I*, however, viewed the impact of the

EXIS database evidence very differently than did the dissent, stating in part:

> Although we agree with Trenkler that the district court erred in
> admitting the EXIS-derived evidence, we nonetheless find the
> error harmless beyond a reasonable doubt.  [Footnote omitted].
> Initially we note that substantial evidence, beyond Trenkler's
> participation in the Quincy bombing, supported a finding that he
> had built the Roslindale bomb.  Principally, David Lindholm
> convincingly testified that, in fact, Trenkler had actually admitted
> building the Roslindale bomb.  Other admissions by Trenkler made
> to various law enforcement officers inferentially corroborated
> Lindholm's testimony, specifically, Trenkler's sketch of the
> Roslindale bomb, drawn shortly after the explosion and
> conspicuously featuring two electrical blasting caps. …
>
> Furthermore, the government offered the EXIS-derived evidence
> to prove that the Roslindale and Quincy bombs were so similar
> that they evinced the signature of a single bomb maker, thus,
> establishing the Quincy bomb evidence on the issue of identity.
> Our review of the evidence, however, convinces us that the EXIS-
> derived evidence was not a critical factor in the district court's
> decision to admit the Quincy bomb evidence for the purpose of
> providing identity.  The EXIS-derived evidence was merely
> cumulative, corroborating the testimony of the government's
> explosives expert who, after testifying in detail about the
> similarities between the two bombs, stated that he had no doubt
> "whatsoever" that the same person built both bombs.  [Footnote
> omitted].

*Trenkler I,* 61 F.3d at 60-61.       The majority also viewed very differently the dissent's concern

regarding the trustworthiness of Lindholm's testimony:

> We note with some concern our dissenting colleague's suggestion
> that, notwithstanding Lindholm's testimony (elicited by the U.S.
> Attorney) that the government had not offered or promised
> Lindholm any consideration for his testimony, an implicit *quid pro
> quo* nonetheless existed for his cooperation.  [Cite omitted].  We
> find nothing in the record to support such an inference.

*Trenkler I,* 61 F.3d at 60 n. 23.  In any event, in *Trenkler II* the First Circuit affirmed the district

court's denial of a new trial on this ground, stating, in part:

> The district court rightly observed that nothing in the record
> indicates that Lindholm perjured himself indicates that Lindholm
> perjured himself or that his early release from prison was the result
> of a deal made prior to the trial that the government failed to
> disclose.  Rather, all evidence, including an affidavit from an
> assistant U.S. attorney which the defendant has not challenged,
> unequivocally leads to the conclusion that Lindholm's early
> release arrangement was mad several months after the Trenkler
> trial.

*Trenkler II,* 1998 WL 10265 at *3.

This Court next considered that "the evidence and verdict at Shay, Jr.'s trial reflect a jury

finding that Shay, Jr. intended only to damage his father's car; the government made no mention

of insurance proceeds at Shay, Jr.'s trial."  Order, 537 F.Supp.3d at 105.  But the Court's citation

is to the transcript of Shay, Jr.'s guilty plea, not his trial. *See* Exh. 1 to the Motion at 10-12.  The

jury at Shay, Jr.'s separate trial acquitted him of the only count that charged him with conduct

resulting in the death of another person, and the statement of facts recited at Shay Jr.'s plea

simply reflected this reality.

The Court also considered letters from five of the jurors in the defendant's trial.  *See* ECF

777 (collecting letters).  They all were written approximately 15 years after the trial.  Some of

them refer to information of which they had become aware since the trial, *see* ECF 777 at 4

("[T]here is some information that I have become aware of that I believe … would [have] made

a difference to the decision that I agreed on"); ECF 777 at 5 ("Recently I have received an

reviewed information on the Alfred Trenkler case that I originally saw and heard while serving

as a juror on that case.").  One of the jurors explicitly stated she had read, among other things,

"Mr. Trenkler's post trial notes," obviously information that was not presented at trial and that

has never been subjected to cross-examination.  The government is aware that *Perfectly Innocent: The Wrongful Conviction of Alfred Trenkler* was published as an ebook by Morrison Bonpasse on January 19, 2015.  *See* https://www.scribd.com/book/254030520/Perfectly-Innocent- The-Wrongful-Conviction-of-Alfred-Trenkler (last accessed 10/31/2022).  The foregoing site includes information from www.alfredtrenklerinnocent.org that includes part of a message dated October 10, 2007 and addressed to readers of Version 9 of the Manuscript edition of *Perfectly Innocent.*  The partial message includes the following:

> The manuscript is the latest version of copies which are being sent to people affected by, or involved in, the Roslindale Bomb case, including the trials of Tom Shay and Alfred Trenkler.  They are being brought or sent to the families of Jeremiah Hurley and Francis Foley and to the judges, prosecutors, witnesses and investigators.  **To the extent possible, they are being brought or sent to the jurors in both trials.**  [Emphasis added].

In light of the foregoing, the government believes it highly likely that the jurors who wrote letters had been exposed to a version of *Perfectly Innocent* that included, among other things, statements of the defendant that were not part of the trial record and, as noted, were never subjected to cross-examination.  They should play no role in this Court's assessment of the Motion.

In any event, at the end of the day the Court concluded that this combination of proposed bases for compassionate release – the concerns of the dissent in *Trenkler I*, the evidence and verdict at the Shay trial, and the juror letters – "are not sufficient to establish extraordinary and compelling circumstances."  Order, 537 F.Supp.3d at 105.

The last proposed basis for compassionate release that this Court considered before turning to the sentencing error was the disparity between Shay, Jr.'s and the defendant's sentences.  Order, 537 F.Supp.3d at 105.  The Court recognized that this disparity "does not

amount to extraordinary and compelling circumstances," although the court indicated it should
be considered in determining the extent of a reduction if the Court were to find a basis for
compassionate release elsewhere.

In the final analysis, this Court rejected each of the defendant's proffered bases for
compassionate release, with the sole exception of the sentencing error.  While the government
recognizes that the Court is now called upon to view these proposed bases in the aggregate, there
is nothing to suggest any synergism among the proposed bases that makes them any more
compelling in the aggregate than they are when considered separately.  The defendant's medical
issues bear no relationship to the issues claimed to undermine confidence in the conviction;
indeed, as shown above, the defendant has significantly overstated concerns with the conviction
in any event.  Neither of these issues enhances, or is enhanced by, the disparity between the
defendant's and Shay, Jr.'s sentences.  And none of these bases has any synergistic relationship
with the sentencing error.  This is not a case in which the whole is greater than the sum of its
parts.  Thus, the defendant has fallen far short of satisfying "the inherently narrow (and
stringent) 'extraordinary and compelling' standard [that] must be met to grant relief."  *Trenkler*,
47 F.4th at 48 n.14.

Accordingly, it would be an abuse of discretion for the Court to allow the Motion, and

- 10 -

the Court should instead deny it.[1]

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     /s/ *Robert E. Richardson*
ROBERT E. RICHARDSON
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Robert E. Richardson*
ROBERT E. RICHARDSON

_____

[1] Although the First Circuit noted that its opinion "should not be read as a rejection or endorsement of the district court's outcome or any of its analysis of Trenkler's proposed reasons for granting compassionate release," *Trenkler*, 47 F.4th at 50, one member of the panel appeared to express some skepticism at oral argument concerning the weight that should be accorded to the sentencing error factor. *See* Oral Argument at 7:52-8:25 ("I may agree with you . . . that I may not find it particularly compelling that someone is suffering from a legal error that could have been corrected by a timely habeas petition, but that's not to say that the unfairness from that error shouldn't be considered at all, which is the position that the government is taking . . .").

- 11 -